## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**SANDRA JONES, Personal Representative**         **PLAINTIFF**
**of the Estate of ANTONIO L. JONES,**
**Deceased**

**vs.**               **Case No: 4:21-cv-444-BRW**

**FAULKNER COUNTY, ARKANSAS,**        **DEFENDANTS**
**TIM RYALLS, Individually,**
**CHRIS RIEDMUELLER, Individually,**
**Dr. GARRY STEWART, M.D., Individually,**
**KAREN GRANT, Individually, KAREN MUNYAN,**
**SPECIAL ADMINISTRATOR of the Estate**
**of MONTE MUNYAN, Deceased, Individually,**
**and LEANNE DIXON, Individually**

## AMENDED COMPLAINT

Comes now the Plaintiff, Sandra Jones, (Jones) as the Personal

Representative of the Estate of Antonio L. Jones, deceased (Estate), by and through

her attorney, the Morris W. Thompson Law Firm, P.A., and for her Amended

complaint against the Defendants, Faulkner County, Arkansas, (the County), Tim

Ryalls (Ryalls), Chris Riedmueller (Riedmueller), Dr. Garry Stewart, M.D.

(Stewart), Karen Grant (Grant), LeAnne Dixon (Dixon), and Karen Munyan,

Personal Representative of the Estate of Monte Munyan, deceased, (Munyan)

states and alleges as follows:

1

## INTRODUCTION

1.  This is an action brought under 42 U.S.C. § 1983 and various Arkansas state statutes. The Plaintiffs seek redress against Faulkner County for its policies, procedures, customs, and usages which proximately caused violations of the Plaintiff's decedent's rights. In addition, thereto, Plaintiff seeks redress against the County, Ryalls, Riedmueller, Stewart, Grant, Dixon, and Munyan, for their actions which violated her decedent's constitutional rights to be free from unreasonable seizures, unlawful terms and conditions of confinement, all of which protected by the 4th Amendment to the U.S. Constitution as well as federal laws.

2.  Additionally, pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction to hear and decide state causes of action against the defendants arising from the same facts. Plaintiff seeks redress under the Arkansas Constitution, Art. 2 § 2, Art. 2 § 3, Art. 2 § 9, the Arkansas Civil Rights Act, (ACRA), codified at A.C.A. § 16-123-101 et seq., and against the defendants jointly and severally for ordinary negligence, medical and nursing malpractice, and wrongful death. Plaintiff seeks redress for the defendants' violations of these state statutory and common-law causes of actions.

## JURISDICTION AND VENUE

3.  This Court's authority is invoked pursuant to 28 U.S.C. Section 1343(a)(3), the jurisdictional provision of 42 U.S.C. § 1983; original jurisdiction

pursuant to 28 U.S.C. § 1331, federal question jurisdiction; and 28 U.S.C. §§ 220 and 2202.

4.   All parties, for all relevant time periods, were residents of the Central Division of the Eastern District and all acts complained of occurred within said Western Division of the Eastern District.  Consequently, venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

PARTIES

5.   At all relevant times, **Antonio L. Jones** (the decedent) was a resident of Jefferson County, Arkansas. As such he was a citizen of the United States of America and was, therefore entitled to all legal and constitutional rights afforded citizens of the United States of America.

6.   **Sandra Jones** (Ms. Jones), is the duly appointed the Special Administrator of the Estate of Antonio L. Jones, deceased, pursuant to the order of the Jefferson County Circuit Court, in Case No: 35PR-20-180. Attached hereto as exhibit 1 is the July 13, 2020, order appointing her Special Administrator. She brings this action on the behalf of the estate, the heirs and statutory beneficiaries of Antonio L. Jones, Deceased.

7.   **The County** is a municipality organized and existing under the laws of the State of Arkansas.

8.   At all relevant times, the County is and was empowered, funded and

3

directed to pay any § 1983 civil rights judgments for compensatory damages, actual damages, punitive damages and attorney fees for policies, practices, procedures, customs and usages which are a direct and proximate cause of violations of citizens rights.

9.   Per Ark. Const. Art. 7, Sec. 46 and A.C.A. § 14-14-802(a)(2), and at all times relevant, **Ryalls** was the duly elected Sheriff of Faulkner County.

10.   **Riedmueller**, was the Jail Administrator. In that capacity, he was responsible for the day-to-day operations of the FCDC. In that respect, he was charged with the duty to implement the policies, and procedures and practices within the FCDC. In that respect he is a state actor whose actions are cloaked under the color of law.

11.   **Dr. Stewart**, was a medical doctor licensed to practice medicine by the Arkansas State Medical Board, and at all times relevant, employed by the County to perform medical intervention for the inmates and detainees at the FCDC. In that respect he is a state actor whose actions are cloaked under the color of law.

12.   **LPN Grant** is a LPN licensed to practice nursing by the State of Arkansas, was, at all times relevant, employed at the FCDC to perform medical intervention for the inmates and detainees.  LPN Grant is therefore a state actor whose actions are cloaked under the color of law.

13.   **LPN Munyan** is a LPN licensed to practice nursing by the State of

4

Arkansas, was, at all times relevant, employed at the FCDC to perform medical intervention for the inmates and detainees. LPN Munyan was therefore a state actor whose actions are cloaked under the color of law.

14. LPN Munyan is now deceased, and his estate is Administered by his widow, Karen Munyan, pursuant to the Faulkner County Probate Court Order dated December 1, 2020. The Order is attached hereto as Exhibit 2.

15. **MA Dixon**, is a medical assistant, and at all times relevant, employed at the FCDC to perform medical intervention for the inmates and detainees. In that regard, MA Dixon is a state actor and her actions are cloaked under the color of law.

FACTS

16. Ryalls is the legally constituted Sheriff for the County and has functioned in that capacity at all times relevant hereto.

17. Per A.C.A. § 12-41-502, Ryalls has the custody, rule, and charge of the FCDC and all persons held there.

18. Per A.C.A. § 12-41-503(a), Ryalls is the keeper or administrator of the FCDC and responsible for managing the populations and operations of the FCDC in compliance with the laws and the Arkansas Constitution and within the requirements of the United States Constitution.

19. Pursuant to that grant of authority, Ryalls was the final decision maker

5

for the County with regard to the FCDC. Ryalls' decisions and acts in that capacity establish policies of the County.

20.   Per A.C.A. § 12-41-503 (a), Ryalls, had the responsibility for managing the operations of the FCDC in compliance with the Arkansas Constitution, the State laws and within the requirements of the United States Constitution.

21.   Per A.C.A. § 12-41-502, Ryalls is authorized to appoint a jailer to be responsible for the day-to-day operations of the FCD and for whose conduct he is responsible.

22.   Ryalls appointed Riedmueller as Jail Administrator.

23.   Riedmueller was responsible for ensuring that the detention center's personnel were adequately trained and were implementing the County's policies. See *Barton v. Taber*, 908 F.3d 1119 (8th Cir. 2018).

24.   Riedmueller served in that capacity during all relevant time periods and was therefore a state actor whose actions are cloaked under the color of law.

25.   Per A.C.A. § 12-41-502, Ryalls along with the County Judge, signed a contract hiring Dr. Stewart to deliver of proper, adequate, and timely health care services to detainees in custody at the FCDC.

26.   Contracting out prison medical care does not discharge a governmental entity of its constitutional obligation to provide suitable medical care to those in its custody; and although Ryalls signed the contract, Ryalls had a nondelegable duty

6

to provide adequate medical care for Faulkner County detainees. See *West v. Atkins*, 487 U.S. 42 1988).

27.  In pertinent part, Dr. Stewart's duties included, but not limited to:

a.  ... patient intake and screening, needs assessment, and referral to appropriate medical or psychiatric providers. Doctor will direct medical needs and services of the jail to assure compliance with jail regulations; and

c.  Review the Jail Medical Services Plan for inmate healthcare as requested by the Faulkner County Sheriff or his designee.

28.  Dr. Stewart full and final authority in all matters relating to medical care and treatment of FCDC detainees.

29.  Dr. Stewart was charged with the duty to be knowledgeable regarding frequently occurring medical issues such as drug ingestion and overdosing in detention facilities such as the FCDC and develop policies and protocols to address these problems.

30.  Dr. Stewart was charged with the duty to be knowledgeable regarding frequently occurring incidents of drug ingestion and/or body stuffing by newly arriving detainees which frequently lead to overdosing.

31.  Dr. Stewart was charged with the duty to develop policies and protocols to address these frequently occurring problems.

32.  Upon information and belief, Dr. Stewart was knowledgeable regarding frequently occurring incidents of body stuffing by detainees which often lead to overdosing.

7

33.  However, despite his awareness of these frequent incidents and frequent overdosings, he chose not to develop policies and protocols to address these problems.

34.  Dr. Stewart was aware that drug overdose is a significant problem in detention facilities and happening with more and more frequency throughout the nation's detention and correctional facilities. However, despite his awareness of this problem, he chose not to include a protocol for drug overdoses. This decision was deliberately indifferent to the dangers this posed.

35.  For years the FCDC had a 3 ring binder of directives, policies, and procedures which dictated procedures the detention officers were to follow in addressing obvious serious medical conditions of the inmates and detainees. The binder was commonly referred to by Dr. Stewart, Ryalls, Riedmueller, and FCDC personnel as the "medical book".

36.  The "medical book" policies dictate how detention officers are to respond to detainees' common and serious medical conditions.

37.  Dr. Stewart, Ryalls, and Riedmueller accepted, adopted, acquiesced to the practice and use of the "medical book's" policies for responding to detainees' common and serious medical conditions.

38.  The medical book had a number of obvious deficiencies that would cause detention personnel to violate FCDC inmate and detainees' constitutional rights to adequate medical care.

39.  The very top of the first page of the "medical book" states in large font and bold letters: "**\*Criteria To Be Obtained Prior To Calling The Nurse\*** (April 19, 2012)." After listing several criteria, the bottom of the page states in large font and bold print:

"<u>**DO NOT SEND ANY INMATE TO ER WITHOUT NURSE APPROVAL!**</u>"

40.  First and foremost, the "medical book" does not have a specific policy or directive for the detention officers regarding what actions they are to take with respect to drug overdoses.

41.  Dr. Stewart, Ryalls, and or Riedmueller knew or should have known that this deficiencies would cause the officers to fail to obtain timely and needed medical care for the detainees undergoing life threatening drug overdoses.

42.  Yet despite their awareness of this obvious problem, Dr. Stewart, Ryalls, and Riedmueller chose not to correct them. Their decisions not to require or provide this critical policy was a deliberate choice of policy.

43.  The "medical book" provided no instruction for the detention officers on how to properly take vital signs and report the data to the medical staff.

44.  Dr. Stewart, Ryalls, and or Riedmueller knew or should have known

that these deficiencies would cause the officers to fail to obtain timely and needed medical care for the detainees' serious medical conditions.

45.  Yet despite their awareness of these obvious problems, Dr. Stewart, Ryalls, and Riedmueller chose not to correct them. Their decisions not to require or provide this critical training was a deliberate choice of policy.

46.  Furthermore, the "medical book" policies placed the onus on untrained detention officers to make medical assessments before they are permitted to contact the nurse with their concerns.

47.  The County thus placed the responsibility on untrained detention officers to initial medical assessments.

48.  Dr. Stewart, Ryalls, and or Riedmueller knew or should have known that these deficiencies would cause the officers to fail to obtain reliable results which would lead to a failure to provide timely and needed medical care for the detainees' serious medical conditions.

49.  Yet despite their awareness of the risk of these obvious problems, Dr. Stewart, Ryalls, and Riedmueller chose not to correct them. Their decisions not to require or provide this critical training was a deliberate choice of policy.

50.  The detention officers are not trained in how to triage medical conditions.

51.  The detention officers are not trained in how to properly take, record,

and report vital signs.

52.  Dr. Stewart, Ryalls, and or Riedmueller knew or should have known that this failure in training would lead to a failure to provide timely and needed medical care for the detainees' serious medical conditions.

53.  Yet despite their awareness of the risk of these obvious problem, Dr. Stewart, Ryalls, and Riedmueller chose not to correct it. Their decisions not to require or provide this critical training was a deliberate choice of policy.

54.  Dr. Stewart's, Ryalls', and/or Riedmueller's decision to adopt and use the deficient policies of the "medical book" was deliberately indifferent to the dangers this posed.

55.  Under his authority as set out herein above, Dr. Stewart established the FCDC medical protocols, entitled "Treatment Protocols, (Medical Staff Only)".

56.  Dr. Stewart chose not to provide protocols for apparent drug overdoses for the medical staff regarding drug overdoses. This decision was deliberately indifferent to the dangers this posed.

57.  Dr. Stewart's protocols as set out in the "medical book" and the FCDC "Treatment Protocols, (Medical Staff Only)" were policies for the FCDC personnel to follow.

58.  Dr. Stewart's decision not to include directives for the medical staff in the "Treatment Protocols, (Medical Staff Only)" for drug overdoses was

deliberately indifferent to the dangers this posed to the detainees with whom they would come into contact.

59.  On August 7, 2019, Antonio L. Jones was arrested in Russellville, AR on a Failure to Appear at a child support hearing in Faulkner County and was held overnight in the Pope County jail.

60.  The next morning a Faulkner County Sheriff's Dept transport officer assumed custody of Antonio Jones and transported him to Conway, Arkansas arriving at the FCDC at approximately 9:46 am.

61.  At approximately 10:09 the detention officers began booking Antonio Jones in but halted book in before completion. Antonio L. Jones was placed in a cell.

62.  A few minutes before 3 pm, Antonio L. Jones was taken from the cell to be fingerprinted and finish the book in process.

63.  About that time, a detainee who had been in the cell with Jones told the book in officer that Antonio L. Jones needed to be watched.

64.  As Antonio L. Jones came into view, the desk officer observed him noticeably shaking, profusely sweating and appearing as though he was about to pass out, backing up against a cell trying to catch his balance.

65.  The detention officer attempting to fingerprint Antonio Jones noted that Jones was sweating profusely and shaking vigorously. Pursuant to the "medical

book" policies he attempted to take Antonio's vital signs before contacting the

Grant in the infirmary about Jones' condition.

66. MA Dixon noticed the detention officers' attention to Antonio L. Jones'

and Jones' medical distress. Dixon attempted to assist the officer in obtaining

Jones' vitals.

67. MA Dixon called the infirmary to advise LPN Grant of Jones'

condition. MA Dixon advised LPN Grant that Jones was shaking, sweating, eyes

were really red, and that the detention officers could not get his vitals due to

Antonio L. Jones shaking so badly.

68. LPN Grant ordered MA Dixon to test Antonio L. Jones' blood sugar.

Dixon and the detention officer did so.

69. While working with the detention officer, MA Dixon could not get a

temperature or blood pressure readings because Antonio L. Jones was shaking too

much. The cuff kept giving them an "error" reading.

70. MA Dixon asked Antonio L. Jones if he was diabetic and Jones replied

that he might be type 2, but he wasn't sure. Due to the shaking, the detention

officer had to hold Antonio L. Jones' finger while MA Dixon stuck Antonio's

finger.

71. The sample showed a blood sugar level of 84, which, according to the

detention officers' "medical book", did not warrant calling the nurse.

72.  A few minutes later MA Dixon called LPN Grant again with the results and advised her that they could not get a temperature or blood pressure reading because Antonio L. Jones was shaking too much.

73.  Rather than coming to see Antonio Jones or instructing the detention officers to bring him to the infirmary, LPN Grant told MA Dixon that she (LPN Grant) was not needed, and ordered that Antonio L. Jones to be placed on a medical watch for 4 hours.

74.  Medical watch consists of sitting a detainee on a bench handcuffed, in front of the intake desk where he or she is out in the open and can be observed.

75.  The detention officer placed Jones on the bench, handcuffed and started the medical watch.

76.  The FCDC Suicide and Medical Watch Protocol directs:

1.   Obtain permission from the nurse.
2.   Closely Monitor.
3.   Check every 15 minutes.
4.   Release when informed by nurse.
5.   Make sure you place this report in the medical box by the end of your shift.
6.   Follow medical directive with no deviation.

77.  Within a minute or two, the detention officers called LPN Grant again advising her Jones' condition was worsening and to find out how often Jones' vitals were to be taken. LPN Grant instructed that Jones' vitals were to be taken every hour.

78.  MA Dixon then turned her attention to other duties and took no further action to tend to Antonio Jones' obvious serious medical needs.

79.  Two other detention officers in the book-in area were also concerned about the seriousness of Jones' condition and got Jones a cup of water. However, Jones was shaking so violently, that he, (Jones), could not hold it and spilled it on himself and the floor.

80.  Jones' condition had deteriorated further, and he began making grunting sounds. Jones' condition continued to worsen and when he was checked, although the grunting had stopped, he was salivating heavily.

81.  At approximately 4:20 pm, Jones' blood pressure read 103/85 and pulse rate 91 as taken by the detention officer. According to the "medical book" Jones' blood pressure was within the normal range, not warranting calling the nurse.

82.  At approximately 4:30 pm LPN Munyan came on duty and was given the report on Antonio Jones' worsening condition.

83.  Later another detention officer called the infirmary to report Antonio L. Jones' condition

84.  LPN Grant was scheduled for 8 am to 4:30 pm but was still in the clinic after 4:30 pm. LPN Grant took the call.

85.  The detention officer informed LPN Grant that they could not get Jones' vitals due to him shaking so bad, and that he was still sweating profusely.

15

86.  LPN Grant's only action was to reply that Jones was already on medical watch, that he might have taken something, and that she was not the nurse on call.

87.  Upon information and belief, LPN Grant informed LPN Munyan of the call.

88.  At approximately 4:45 pm, the detention officer called the infirmary another time. Although on duty, Munyan did not take the call. LPN Grant took the call. The detention officer again requested that she come see Antonio Jones.

89.  Neither LPN Grant nor LPN Munyan went to see, examine, or otherwise tend to or care for Antonio Jones.

90.  At approximately 5:10 pm, a detention officer shook Antonio Jones with no response. The detention officer popped ammonia capsules under Antonio Jones' nose 3 times with no response. Antonio Jones then began bleeding from mouth and nose and collapsed.

91.  The detention officer advised LPN Grant of what happened and she then left the clinic and came to detention to examine Antonio Jones. Antonio Jones was then un-cuffed, laid on floor, with CPR started, and shocked 10 times to no avail.

92.  At approximately 5:24, Taylor Martin, the Faulkner County Attorney, authorized Riedmueller, to release Antonio Jones to the hospital.

93.  At approximately 5:23, the Ambulance crew arrived to find Antonio Jones asystolic. After a few minutes Antonio Jones was pronounced dead.

FEDERAL CIVIL RIGHTS
VIOLATIONS UNDER 42 USC § 1983

94.  The Plaintiff specifically adopts by reference the factual allegations contained in paragraphs five (5) through ninety-three (93).

FAULKNER COUNTY

95.  Plaintiff seeks redress against the County for Ryalls' failure to adequately instruct, train, and supervise FCDC personnel which resulted in the violation of Antonio L. Jones' rights protected by the 4th Amendments to the U.S. Constitution and federal laws.

96.  Ryalls failed to adequately monitor, and supervise, FCDC medical staff, to include Dr. Stewart, LPN Grant, LPN Munyan, and MA Dixon in the delivery of proper, adequate, and timely health care services to County's detainees in custody at the FCDC.

97.  Ryalls' adoption of, ratification, and/or implementation of medical policies, customs, usages, procedures, and practices within the FCDC, whether formal or informal, are County policies.

98.  Ryalls' conscious decisions from among known alternatives underly the County's liability. These decisions were taken with the awareness of the likely risks to the inmates and detainees and were deliberately indifferent to the potentially fatal consequences to the FCDC inmates' and detainees, such as

Antonio Jones.

99.  Riedmueller failed to adequately train, monitor, and supervise FCDC personnel which resulted in violation of Antonio L. Jones' rights protected by the 4th Amendments to the U.S. Constitution, federal laws, the Arkansas Constitution and the ACRA.

100.  Ryalls' conscious decisions from among known alternatives underly the County's liability. These decisions were taken with the awareness of the likely risks to the inmates and detainees and were deliberately indifferent to the potentially fatal consequences to FCDC detainees, such as Antonio Jones.

101.  Dr. Stewart knew that newly arrested detainees ingesting drugs or stuffed drugs in body cavities to avoid detection was an increasing occurrence and one which frequently led to drug overdosing when the package leaked the drug into their system.

102.  Dr. Stewart was aware of the need for the FCDC staff to have adequate training on how to attend to and care for FCDC inmates and detainees who had obvious and serious medical conditions such as undergoing drug overdoses.

103.  Dr. Stewart chose these policies although he knew they were deficient in that they did not provide FCDC personnel adequate instruction on how to attend to and care for FCDC inmates and detainees who had obvious and serious medical conditions due to drug overdoses.

104.  Dr. Stewart was aware that the "medical book" was inadequate to instruct the detention officers what to do when they were confronted with an inmate or new detainee in crisis from a drug overdose. The contents of the "medical book" were deliberate choices which he knew was inadequate. His policy decision reflected deliberate indifference to detainees, such as Antonio Jones' 4th and 14th amendment rights.

105.  Dr. Stewart's decision to require detention officers to make medical assessments before they are permitted to refer detainees to the nurse reflected a deliberate choice to screen detainees by untrained detention officers. His policy decision reflected deliberate indifference to detainees, such as Antonio Jones' 4th and 14th amendment rights.

106.  Furthermore, Dr. Stewart's decision to prohibit detention officers from taking detainees with known serious medical conditions to a hospital ER or call for an ambulance without approval from a nurse reflected a financial choice which protected the expenses of the FCDC at the expense of the health, safety and welfare of the detainees.

107.  Poor nursing and medical care are the obvious and expected outcome of this financial decision. This policy of placing financial concerns over the health of the captive population reflects a policy indifferent to the rights of the jail population.

108.  Dr. Stewart's conscious decisions as Medical Director, from among known alternatives underly the FCDC's liability. These decisions were taken with the awareness of the likely risks of such policies; and as such was deliberately indifferent to the potentially fatal consequences to the FCDC inmates' and detainees, such as Antonio Jones.

109.  Dr. Stewart's failure to provide adequate policies and training for the FCDC staff was deliberate indifference to the rights of the FCDC inmates and detainees with whom they would come into contact.

110.  These policies as established by Dr. Stewart reflects deliberate indifference to detainees, such as Antonio Jones', 4th and 14th amendment rights.

111.  Plaintiff seeks redress against the County for the policies and practices Ryalls, Stewart, and Riedmueller established for the FCDC, which the County adopted and ratified, and which caused the violation of the civil rights of her decedent and other detainees entrusted in the care of the County with respect to their known serious medical conditions.

112.  The County is thereby liable for all such decisions by Ryalls, Riedmueller, and Dr. Stewart for the policies, practices, customs, and usages of the FCDC which were deliberately indifferent to the rights of the inmates and detainees with whom the FCDC staff came into contact; and which were the

proximate cause and motivating factor leading to the violations of Antonio Jones' rights.

113.  Antonio Jones' rights and privileges protected by the U.S. Constitution and federal laws were clearly established on August 7, 2019.

114.  As a governmental entity, the County is not entitled to qualified immunity.

<u>Deliberate Indifference to Serious Medical Needs</u>

115.  The Plaintiff specifically adopts by reference the factual allegations contained in paragraphs five (5) through ninety-three (93).

KAREN GRANT, LPN

116.  On the day in question LPN Grant was present to perform her duties as described in her job description, the Arkansas and national nursing standards, and within her nursing expertise.

117.  LPN Grant was aware of Antonio Jones' serious medical condition, that Jones' medical condition was serious and that he needed timely and proper medical care and attention. Instead, she left Jones on the 4 hour medical watch. She failed or refused to see to it that she or the other on duty LPN timely examined and treated Jones or see to it that the medical director was informed and/or otherwise see to it that Jones was sent to the emergency room. As the proximate result of this deliberate indifference, within the hour Antonio Jones was dead.

118.  LPN Grant was aware that Antonio Jones' medical condition were serious and needed proper medical care and attention. She was aware that despite his protestations, he had probably ingested some drug. Despite her awareness, she refused to examine him herself or contact the medical director for instructions. Instead, she told the detention officers to place him on a 4 hour medical watch which consisted of seating him on a bench handcuffed and taking his vitals every 4 hours.

119.  Despite her awareness, LPN Grant abandoned Antonio Jones in the midst of his health crisis and tended to other duties. Instead, she stated that Antonio Jones should be seen by LPN Munyan. However, she did nothing to ensure that LPN Munyan provided appropriate and timely medical intervention for Antonio Jones.

120.  LPN Grant's actions were deliberate and as the proximate result of this indifference, within a matter of a couple of hours Antonio Jones was dead.

121.  As the proximate result of this deliberate indifference, within a matter of a couple of hours Antonio Jones was dead.

122.  LPN Grant is being sued for her deliberate delay in providing timely proper medical care for Antonio L. Jones' known serious medical needs which amounts to deliberate indifference in violation of his rights.

123.  Antonio Jones' rights and privileges protected by the U.S. and Arkansas Constitutions were clearly established on August 7, 2019.

124.  Antonio L. Jones's rights were so clearly established that LPN Grant is not entitled to qualified immunity.

MONTE MUYAN, LPN

125.  On the day in question Munyan was present to perform his duties as described in his job description, Arkansas and national nursing standards, and within his nursing expertise.

126.  LPN Munyan was aware of Antonio Jones' serious and worsening medical condition but failed to promptly tend to Antonio Jones and/or inform the medical director to ensure that Antonio Jones was provided timely proper care for his known serious medical condition, or that Jones was sent to the emergency room. He was aware that Jones had probably ingested some drug. But despite his awareness, he refused to examine Jones or contact the medical director for instructions or ensure that Antonio Jones was timely seen by the doctor. The foregoing decision to withhold critical care, despite his awareness of Antonio Jones' serious medical condition, was deliberate indifference.

127.  LPN Munyan was aware that Antonio Jones' medical condition was serious and needed proper medical care and attention. He was aware that Jones had probably ingested some drug. Despite LPN Munyan's awareness, he refused

examine Jones himself or contact the medical director for instructions. Instead, he left Jones on the 4 hour medical watch. As the proximate result of this deliberate indifference, within the hour Antonio Jones was dead.

128. LPN Munyan is being sued for his deliberate delay in providing timely proper medical care for Antonio L. Jones' known serious medical needs which amounts to deliberate indifference in violation of his rights.

129. Antonio Jones' rights and privileges protected by the U.S. and Arkansas Constitutions were clearly established on August 7, 2019.

130. Antonio L. Jones's rights were so clearly established that LPN Munyan is not entitled to qualified immunity.

KAREN DIXON MA

131. On the day in question, MA Dixon was working in the jail as medical assistant, passing out medications and performing other duties within her job description and medical assistant expertise.

132. MA Dixon was aware of Antonio Jones' serious medical condition. However, she failed to inform the duty nurses of changes in Jones' condition, that it was rapidly worsening. Despite her awareness, she abandoned Antonio Jones in the midst of his health crisis and tended to other duties. She failed to keep the medical staff informed of Antonio Jones' rapidly deteriorating health conditions.

133.  The foregoing failure, despite MA Dixon's awareness of Antonio Jones' serious medical condition, was deliberate indifference. Her actions were deliberate and as the proximate result of this deliberate indifference, within a matter of a couple of hours Antonio Jones was dead.

134.  MA Dixon is being sued for her deliberate delay in securing proper and timely medical care for Antonio L. Jones' known serious medical needs which amounts to deliberate indifference in violation of his rights.

135.  Antonio Jones' rights and privileges protected by the U.S. and Arkansas Constitutions were clearly established on August 7, 2019.

136.  Antonio L. Jones's rights were so clearly established that MA Dixon is not entitled to qualified immunity.

137.  As a direct result of the defendants' deliberate indifference to his serious medical needs, Antonio Jones endured needless pain and suffering prior to his death.

138.  The above recited acts and omissions of defendants, while each was acting under color of their authority and in their individual capacities, respectively constitute a deprivation of Antonio Jones' constitutional rights to life and liberty, as guaranteed by the 4th, and 14th Amendments to the United States Constitution.

139.  As a direct result of the defendants' deliberate indifference to his serious medical needs, Antonio Jones suffered the loss of his life. The individual

defendants are jointly and severally liable for the damages suffered by the plaintiff's decedent.

## STATE LAW CLAIMS

### VIOLATIONS OF THE ARKANSAS CONSTITUTION

140.  The Plaintiff specifically adopts by reference the factual allegations contained in paragraphs five (5) through ninety-three (93).

141.  The aforesaid acts constitute violations of Ark. Const. Art. 2 § 2, the right to Life and Liberty; Ark. Const. Art. 2 § 18, Privileges and Immunities clause; Ark. Const. Art. 2 § 21, the right to Liberties and Privileges; and Ark. Const. Art. 2 § 22, right to Life and Liberty. Plaintiff seeks redress pursuant to Ark. Const. Art. 2 § 13.

### VIOLATIONS OF THE ARKANSAS CIVIL RIGHTS ACT, (ACRA), A.C.A. § 16-123- 101 et seq.

142.  The Plaintiff specifically adopts by reference the factual allegations contained in paragraphs five (5) through ninety-three (93).

143.  The aforesaid acts constitute violations of the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123- 101 et seq.

144.  Plaintiff seeks redress pursuant to A.C.A. § 16-123- 105(a), which provides:

Every person who, under color of any statute, ordinance, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within he jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress.

145.  The foregoing acts on the part of Ryalls, Reidmueller, Stewart, Grant, Munyan, and Dixon were in deliberate indifference to Antonio Jones' obvious serious medical needs.

## MEDICAL MALPRACTICE

### DUTIES OF STEWART, GRANT, MUNYON, AND DIXON

146.  The Plaintiff specifically adopts by reference the factual allegations contained in paragraphs five (5) through ninety-three (93).

147.  At all times relevant hereto, Stewart, Grant, Munyon, and Dixon were employed by FCDC as persons to perform medical interventions for the detainees.

## COUNT I- DR. GARY STEWART

148.  At all times relevant hereto, Dr. Stewart was acting as medical director or the jail physician for the FCDC pursuant to a contract by and between himself and the County.

149.  As medical director of FCDC, Dr. Stewart had a duty to form, adopt and enforce policies and procedures for the medical care of detainees, including Antonio Jones, at the FCDC.

150.  As medical director of FCDC, Dr. Stewart had a duty to assure that all persons who performed any type of medical interventions for detainees were adequately trained and supervised in the policies and procedures applicable to detainees.

151.  Dr. Stewart, while acting pursuant to contract with FCDC, as medical director, was grossly medically negligent with a conscious and deliberate indifference to the health and life of Antonio Jones, in and of the following manners:

> (a)  Failure to properly supervise and train Nurse Grant in rendering aid to persons who display clinical signs and symptoms experienced by Jones;
>
> (b)  Failure to adopt policies and procedures that were designed to address the taking of vital signs by persons with no medical training such as Officers;
>
> (c)  Failure to adopt policies and procedures designed to recognize or address the possibility that a detainee had taken something such as methamphetamine;
>
> (d)  Failure to create an environment whereby Nurse Grant was willing and able to contact him in the event of an emergency;
>
> (e)  By requiring that only a Nurse could approve emergent medical care for Jones;

(f)     Failure to adopt and enforce criteria to call the nurse when vital signs can not be accurately obtained;

(g)     Failure to adopt and enforce criteria whereby nursing evaluations of detainees are mandatory

(h)     Otherwise adopting, training and enforcing policies that would have caused Nurse Grant to render immediate and emergent care to Jones.

152.   The events set forth above constitute medical negligence in that

Stewart, while in the course or scope of his contract with FCDC:

(i)     Grossly and with deliberate indifference departed from the acceptable and applicable standard of care in the proper pursuit and performance of his treatment and care of Jones;

(j)     Grossly and with deliberate indifference departed from the applicable standard of care and skill expected and required of similar medical providers;

(k)     Grossly and with deliberate indifference  failed to act in accordance with the applicable standard of care required for medical care and treatment in Faulkner County, Arkansas, or in a similar locality; and, failed to properly supervise and train Nurse Grant in rendering aid to persons who display clinical signs and symptoms experienced by Jones; failed to adopt policies and procedures that were designed to address the taking of vital signs by persons with no medical training such as Officers; failed to adopt policies and procedures designed to recognize or address the possibility that a detainee had taken something such as methamphetamine; failed to create an environment whereby Nurse Grant was willing and able to contact him in the event of an emergency; required that only a Nurse could approve emergent medical care for Jones; failed to adopt and enforce criteria to call the nurse when vital signs can

not be accurately obtained; failed to adopt and enforce criteria whereby nursing evaluations of detainees are mandatory and otherwise failed to adopt, train and enforce policies that would have caused Nurse Grant to render immediate and emergent care to Jones.

(l)    On August 8, 2019, as this was the appropriate standard of care for Faulkner County, Arkansas, or for a medical provider or nurse practicing in a similar locality.

## COUNT II-NURSE KAREN GRANT, LPN

153.  As an LPN, Grant was responsible for the care and medical treatment of detainees at FCDC, including Antonio Jones, and was further responsible to know, enforce and apply the policies and procedures adopted by FCDC to provide for the medical care of detainees.

154.  As an LPN, Grant was responsible to have knowledge of and apply the standard of care for the medical care and treatment of detainees, including Antonio Jones, at the FCDC.

155.  LPN Grant, while acting in the course and scope of their employment with FCDC, was grossly medically negligent with a conscious and deliberate indifference to the health and life of Antonio Jones, in and of the following manners:

(a)    Failure to properly, timely and accurately evaluate Jones for distress requiring immediate medical intervention including but not limited to proper medical interventions including transfer to a local emergency room;

(b)     Failure to adopt a care plan to provide required medical assistance to save Jones' life;

(c)     Failure to take proper steps to secure other emergent assistance to render aid to Jones;

(d)     Failure to have adequate staff on call and within reach to render emergent aid and assistance to Jones;

(e)     otherwise failing to render proper medical care and nursing interventions in accordance with the local standard of care;

(f)     Failure to timely notify a physician or other qualified medical care provider regarding the distress of Jones;

(g)     Failure to enforce and apply policies regarding the times and events when medical providers should seek emergent medical intervention;

(h)     in failing to differentially diagnose the critical nature of the Jones' medical condition;

(i)     Failure to invoke the chain of command for and on behalf of Jones;

(j)     Failure to develop a plan of care designed to prevent harm to Jones;

(k)     in failing to advocate for the care and life of Jones;

(l)     Failure to assist Officers in obtaining Jones' vital signs;

(m)    Failure to go to Jones' side and evaluate him given the information she was provided by the detention officers;

(n)     Failure to evaluate Jones for a drug overdose as she recognized and related to Officers that he "probably has taken something";

(o) Failure to follow policies on seizure activity, narcotic withdrawal, amphetamine withdrawal, and hypertension;

(p) otherwise failing to follow the standard of care as it would require medical and nursing interventions to prevent harm to Jones.

156. The events set forth above constitute gross medical negligence with a deliberate indifference to the life and health of Antonio Jones in that Nurse Grant, while in the course or scope of her employment with FCDC:

(q) Grossly and with deliberate indifference departed from the acceptable and applicable standard of care in the proper pursuit and performance of their treatment and care of Jones;

(r) Grossly and with deliberate indifference departed from the applicable standard of care and skill expected and required of similar medical providers;

(s) Grossly and with deliberate indifference failed to act in accordance with the applicable standard of care required for medical care and treatment in Faulkner County, Arkansas, or in a similar locality; and,

(t) On August 8, 2019, Nurse Grant, who was responsible for the care and treatment of Antonio Jones, having recognized and verbalized that he probably took something, failed to timely and properly evaluate him for immediate medical intervention, failed to timely notify a qualified medical provider who could provide medical interventions to prevent harm; failed to render immediate care to Jones; failed to develop a plan of care that was designed to prevent harm to Jones, failed to render treatment to safeguard his life and health, failed to timely notify a physician of his condition;  failed to invoke the chain of command in order to provide timely medical interventions to

Jones , failed to advocate for the health and safety of Jones, failed to provide other timely medical interventions to prevent harm to Jones ,and failed to properly apply policies and procedures as this was the appropriate standard of care for Faulkner County, Arkansas, or for a medical provider or nurse practicing in a similar locality.

## COUNT III-NURSE MONTE MUNYAN, LPN

157.  As an LPN, Munyan was responsible for the care and medical treatment of detainees at FCDC, including Antonio Jones, and was further responsible to know, enforce and apply the policies and procedures adopted by FCDC to provide for the medical care of detainees.

158.  As an LPN, Munyan was responsible to have knowledge of and apply the standard of care for the medical care and treatment of detainees, including Antonio Jones, at the FCDC.

159.  Nurse Munyan, while acting in the course and scope of his employment with FCDC, was grossly medically negligent with a conscious and deliberate indifference to the health and life of Antonio Jones, in and of the following manners:

  (a)   Failure to properly, timely and accurately evaluate Jones for distress requiring immediate medical intervention including but not limited to proper medical interventions including transfer to a local emergency room;

  (b)   Failure to adopt a care plan to provide required medical assistance to save Jones' life;

(c)     Failure to take proper steps to secure other emergent assistance to render aid to Jones;

(d)     Failure to have adequate staff on call and within reach to render emergent aid and assistance to Jones;

(e)     otherwise failing to render proper medical care and nursing interventions in accordance with the local standard of care;

(f)     Failure to timely notify a physician or other qualified medical care provider regarding the distress of Jones;

(g)     Failure to enforce and apply policies regarding the times and events when medical providers should seek emergent medical intervention;

(h)     Failing to differentially diagnose the critical nature of the Jones' medical condition;

(i)     Failure to invoke the chain of command for and on behalf of Jones;

(j)     Failure to develop a plan of care designed to prevent harm to Jones;

(k)     Failing to advocate for the care and life of Jones;

(l)     Failure to assist Officers in obtaining Jones' vital signs;

(m)    Failure to go to Jones' side and evaluate him given the information she was provided by the detention officers;

(n)     Failure to evaluate Jones for a drug overdose as it recognized and related to Officers that he "probably has taken something";

(o)     Failure to follow policies on seizure activity, narcotic withdrawal, amphetamine withdrawal, and hypertension;

(p)     otherwise failing to follow the standard of care as it would require medical and nursing interventions to prevent harm to Jones.

160.  The events set forth above constitute gross medical negligence with a deliberate indifference to the life and health of Antonio Jones in that Nurse Munyan, while in the course or scope of his employment with FCDC:

(a)     Grossly and with deliberate indifference departed from the acceptable and applicable standard of care in the proper pursuit and performance of their treatment and care of Jones;

(b)     Grossly and with deliberate indifference departed from the applicable standard of care and skill expected and required of similar medical providers;

(c)     Grossly and with deliberate indifference failed to act in accordance with the applicable standard of care required for medical care and treatment in Faulkner County, Arkansas, or in a similar locality; and,

(d)     On August 8, 2019, Nurse Munyan, who was responsible for the care and treatment of Antonio Jones, having recognized and verbalized that he probably took something, failed to timely and properly evaluate  him for immediate medical intervention, failed to timely notify a qualified medical provider who could provide medical interventions to prevent harm; failed to render immediate care to Jones;  failed to develop a plan of care that was designed to prevent harm to Jones, failed to render treatment to safeguard his life and health, failed to timely notify a physician of his condition;  failed to invoke the chain of command in order to provide timely medical interventions to Jones , failed to advocate for the health and safety of Jones, failed to provide other timely medical interventions to prevent harm to Jones ,and failed to properly apply policies and procedures as this was the appropriate standard of care for

Faulkner County, Arkansas, or for a medical provider or nurse
practicing in a similar locality.

LEANNE DIXON, M.A.

161.  Dixon was aware that Antonio Jones' medical condition was serious
and needed proper medical care and attention. She was aware that his condition
was rapidly worsening, and his life was threatened. Despite her awareness, Dixon
abandoned Antonio Jones in the midst of his health crisis and tended to other
duties. Her actions were deliberate and as the proximate result of this indifference,
within a couple of hours, Antonio Jones was dead.

162.  Furthermore, as some of MA Dixon's duties were not medical in
nature, MA Dixon had a duty of ordinary care to perform to the detainees.

163.  MA Dixon was aware that Antonio Jones' medical condition was
serious and proper timely medical care and attention was needed. She was also
aware that his health was rapidly deteriorating, and his life was in jeopardy.
Despite her awareness, Dixon abandoned Antonio Jones in the midst of his health
crisis and tended to other duties. As a result, within a couple of hours Antonio
Jones was dead.

## DAMAGES, PROXIMATE CAUSE AND CLAIM FOR RELIEF

164.  As a proximate result of the aforesaid actions of commission and omission, both gross and with deliberate indifference negligence, Antonio L. Jones endured needless pain and suffering and lost his life.

165.  For the acts, omissions, customs and policies complained of herein, the Plaintiff seeks the following relief:

a.      Compensatory damages for violation of Antonio Jones' rights, privileges, and immunities protected by the United States Constitution and federal laws;

b.      Compensatory damages for violation of Antonio Jones' rights, privileges, and immunities protected by the Arkansas Constitution and state laws;

c.      Compensatory damages for Antonio Jones' pain and suffering, emotional distress, hedonic damages, etc. prior to his death;

d.      Compensatory damages for Antonio Jones' heirs, and statutory beneficiaries are entitled under both § 1983 and state common law for his wrongful death.

e.      Punitive damages;

f.      Reasonable attorney's fees and costs; and,

g.      All other damages to which Antonio L. Jones' estate, heirs, and statutory beneficiaries are entitled

WHEREFORE, Plaintiff, Sandra Jones, as Special Administrator of the Estate of Antonio L. Jones, deceased, requests a judgment against Defendants, jointly and severally, for violation of her decedent's rights protected by the 4th

Amendment to the United States Constitution and federal laws; and for the pendant state claims for violation of the Arkansas Constitution, the Arkansas Civil Rights Act of 1993, state statutory and common law tort claims of ordinary negligence, medical negligence, and wrongful death; for all compensatory and punitive damages; for reasonable attorney's fees and costs; and for all other just and proper relief to which the estate, the heirs and statutory beneficiaries may be entitled.

PLAINTIFF DEMANDS A JURY TRIAL.

Respectfully submitted for Sandra Jones,
Special Administrator of the Estate of Antonio L.
Jones, deceased, plaintiff herein.

Morris W. Thompson

Morris W. Thompson Law Firm, P.A.
P. O. Box 662
 Little Rock, AR  72203
Tele: (501) 661-8100
Fax: (501) 663-3544
E-mail:  mwthompsonlaw@sbcglobal.net
ABN:80145