Grady J. Bazzel, MD, CCHP
4334 North Chapel Road
Franklin, TN 37067

September 7, 2022

    RE:    *Jones v. Faulkner County, et al*
            Case No: 4:21-cv-444-BRW

### Introduction

I am a family practice physician licensed to practice medicine in multiple states. Due to my practice being exclusively centered on corrections since 2005, I am very familiar with delivering medical care in such environments.

The following materials were reviewed in preparation of this report:
- First and amended complaints
- Depositions of Homan-Santos, Samanich, Scott, Grant, Riedmueller, and Stewart
- Exhibits to above depositions (if applicable)
- Faulkner County Sheriff's Office investigative file
- Coroner's Report
- State Crime Lab Report
- Jail File
- Faulkner County response to interrogatories
- "Med Book"
- Medical protocols
- 2019 Medical contract

All opinions expressed in this document are rendered with reasonable medical certainty unless specifically stated otherwise and are based on my experience as a correctional physician, the above referenced materials reviewed, and a review of relevant medical literature. It is my understanding that additional depositions and documents may become available after I submit this report. Consequently, I reserve the right to modify my opinion should additional, pertinent information become available.

AJONES 0072

## Medical Opinion

**Synopsis of Salient Events from reviewed materials:**

August 8, 2019: Mr. Jones arrived at Faulkner County Detention Center (FCDC) at approximately 9:46 AM having been arrested the night before. Over the course of that day, Mr. Jones became shaky and began sweating. Nursing staff instructed the correctional officers to put Mr. Jones on a medical watch. At approximately 5:10 PM, Mr. Jones became unresponsive. CPR was started and Emergency Services were activated. Roughly 13 minutes later, Mr. Jones was pronounced dead. The cause of death was later determined to be methamphetamine intoxication.

## Expert Opinion

I have extensive experience as a medical director at various county jails and state prisons across the United States and am currently the Patient Safety Officer (PSO) and Medical Director of Care Management for Wellpath, one of the largest providers of correctional healthcare in the United States; this role requires me to provide supervision and clinical support to medical providers in over 400 correctional institutions across the country. As part of my duties with Wellpath, I train doctors, mid-level providers, correctional officers, and nurses on the appropriate management of patients in correctional settings. I have practiced in the same or similar circumstances as Dr. Stewart. In fact, I have delivered medical care in correctional facilities in Arkansas on several occasions.

Based on my training, education, and experience, as well as a review of the medical records and other documents in this case, I will testify that the actions of the Dr. Stewart do not rise to the level of deliberate indifference to Mr. Jones. Furthermore, I see no evidence of medical malpractice or negligence. No errors of omission or commission on the part of Dr. Stewart led to the death of this patient. I will testify as to all aspects of the practice of family medicine, both in general and specifically as it relates to correctional facilities. All my opinions are rendered within reasonable medical certainty.

**AJONES 0073**

### Rationale

This case, for Dr. Stewart, falls under the category of you can't treat what you don't know about. At no point during Mr. Jones's brief stay at FCDC was Dr. Stewart ever contacted about him. This is corroborated by Nurse Grant's deposition testimony:

```
22  Q   Did you speak to Dr. Stewart at any time about
23      Mr. Jones?
24  A   No, sir.
25  Q   Did you at any time consider calling Dr. Stewart
```

```
                                                           48
1   about Mr. Jones?
2   A   No, sir.
```

Based on my understanding of medical malpractice, four elements must be present for this condition to exist, and those are (1) a doctor-patient relationship, (2) a breach of this relationship, (3) an injury caused by this breach, and (4) damages as a direct result of the injury[1]. The American Medical Association (AMA) says that a doctor-patient relationship exists when a physician serves a patient's medical needs. Specifically, Dr. Stewart had no knowledge of this patient, never saw this patient, provided no direct or indirect care to him, and gave no orders to render any type of care to him. Based on this information and review of the aforementioned materials, I think it is clear that there was no doctor-patient relationship between Dr. Stewart and Mr. Jones during the time in question.

I think it is important to note that not every person who enters a jail is automatically the patient of the site medical director. This situation is unique and is not like a traditional hospital or nursing home admission where it is typically the treating physician who is directly involved in admitting the patient. A large portion of people who are arrested never require medical services from the physician and thus would not be considered their patient.

Dr. Stewart was hired to be the medical director of FCDC. Specifically, one of his job duties was to direct the medical needs and services of the jail. He did this, in part, by creating medical treatment protocols for the nursing staff to use for routine medical

AJONES 0074

complaints common to a correctional facility. Of course, it would be impossible to create such protocols for every known disease or medical scenario. Furthermore, it was never his intention that such treatment protocols would be used in an outright emergency unless specifically annotated. His deposition testimony reflects this as follows:

```
 7  Q    Let me ask my question again, because we're not
 8  communicating.
 9       In Exhibit 11, which contains many protocols, if a
10  nurse suspected and articulated he might have taken
11  something, meaning an inmate --
12  A    Right.
13  Q    -- might have taken something, and they had that
14  suspicion based on what guards and other employees had
15  told them about that inmate's conduct, which, if any, of
16  the protocols set forth in Exhibit 11 would you expect
17  that nurse to follow?
18            MR. MOSLEY:  Object to form.
19  A    I wouldn't expect her to follow any of them if they
20  had a suspicion that a -- an inmate had taken a drug or
21  something that was causing them distress.  I would expect
22  them to call 911 and send him to the emergency room.
```

As well as here:

**AJONES 0075**

```
 5        Is it true for me to conclude that there is no
 6   protocol in the Faulkner County Treatment Protocols for
 7   Medical Staff that would address or otherwise direct the
 8   nurse if she suspected that someone had overdosed on
 9   methamphetamine or another stimulant?
10               MR. DARST:  Same objection.
11   A   No, she wouldn't need a treatment protocol because
12   she's not going to treat; she's going to -- supposed to
13   call emergency and -- and send that patient out.
```

Another way that Dr. Stewart fulfilled his contractual duties was to clinically supervise the nurses who worked at FCDC. This is done in a variety of ways. He was on-call for the nurses around the clock. They could contact him at any given time for advice about a patient or orders for medical therapy. It is clear from Nurse Grant's deposition that she was aware of this but that it was also necessary for Dr. Stewart to be made aware of a patient in need to be able to fulfill this requirement.

```
 8  Q    Who was directing you as an LPN pursuant to this
 9  particular document?
10              MR. DARST:  Object to form.
11  A    My medical director would be Dr. Stewart.
12  Q    Okay.  How was he directing you?
13  A    He had --
14              MR. DARST:  Same objection.
15  A    -- the white notebook.
16  Q    Okay.  Any other way he was directing you?
17  A    In according to this case or according to other
18  cases?
19  Q    This case.
20  A    No, sir, because I did not call him.  It would be
21  hard for him to -- and I'm not being funny.  I'm just
22  saying, it'd be hard for him to --
23  Q    I understand.
24  A    -- to give me direction if I didn't call him.
```

This does not mean, however, that it was expected that Dr. Stewart was to be looking over the shoulder of each nurse that he clinically supervised, but that he provided ongoing review of their work. This would be done at every clinical encounter that he had with patients there as reviews of previous medical encounters are a routine part of the visit.

There was no expectation that Dr. Stewart give any formal in-services to the nursing staff. Each nurse was licensed by the state of Arkansas. This implies that they went to an accredited nursing program and were deemed fit to carry out their duties as a nurse by the state. These duties would include taking vital signs and recognizing a medical emergency.

AJONES 0077

In the materials that I reviewed, there was much discussion about the "white binder". While Dr. Stewart recognized most of the white binder, there was one page that he was adamant that he neither recognized nor created. This page had to do with what to do before contacting a nurse and gave the instruction to call a nurse before sending a patient to the Emergency Room.

```
19  Q    Let's go back to Exhibit 7 entitled "Criteria to be
20  Obtained Prior to Calling The Nurse."  Is your -- and I
21  don't want to put words in your mouth, sir.  Did you tell
22  me you'd never seen this before, or you just didn't draft
23  it?
24  A    I had seen that as part of another case, but I did
25  not know of its -- of its existence except for that it was
```

WAID REPORTING

VIDEO DEPOSITION

87
```
1  brought forth as -- as an exhibit in another case.
```

Dr. Stewart went on to say that he specifically had no knowledge of this practice being in place during the time in question, but that he did not doubt it.

```
                                                                    87
 1  brought forth as -- as an exhibit in another case.
 2  Q    Okay.  Were you aware of this document being in place
 3  when Anthony -- excuse me -- Antonio Jones became an
 4  inmate on August 9th of 2019?
 5              MR. THOMPSON:  8th.
 6  A    No, sir.
 7  Q    Were you aware that this document has been referred
 8  to throughout various depositions in this case by various
 9  jailers?
10  A    I'm not aware of that, but I don't -- don't doubt
11  that.  That was part of a book that they had in the
12  booking system -- in their booking system.  This is -- I
13  found this out later.  But I had no knowledge of that,
14  that that was part of some documents that somebody had put
15  in there for the -- for the intake staff.  And I think it
16  was done in 2012 by a particular nurse that was there at
17  that time, but I had no knowledge of it.
```

Unfortunately, if you don't know about something, you can't fix it. This particular practice ran contrary to what Dr. Stewart actually wanted. In a memo to the jail staff from Dr. Stewart dated February 5, 2015, item 6 specifically states that it is indeed an option for correctional officers to call him. Furthermore, in his deposition, Dr. Stewart made it clear that he wanted common sense to rule in the case of an emergency.

Specifically, his deposition states:

```
 2      Who makes the decision whether an inmate needs
 3   emergency care?
 4   A   That's a decision that everybody in the facility has
 5   the option to make as a -- as a common-sense decision.
 6   Q   Is there any protocol that you've drafted or guides,
 7   jailers or nurses or anybody else for that matter, as to,
 8   you know, when emergency care is needed or not, aside from
 9   what you said, using your common sense?
10              MR. DARST:  Object to form.
11   A   There is the training from Ms. Moore.
```

Furthermore, this section of his deposition highlights the fact that it was his understanding that appropriate training on this topic was being done that reflected his common sensical approach to emergency situations.

```
                                                              40
 1   Q   In your opinion, does it -- does this training that
 2   Leslie Moore provides, is -- does that satisfy you as an
 3   M.D., or medical director, if you will, that these
 4   jailers, if they paid attention, would be able to find
 5   these visual keys that you'd referred to?
 6              MR. DARST:  Object to form.
 7              You can answer.
 8   A   Yes, it -- it -- it does.  And it's a common-sense
 9   approach that -- that any -- any one of us should pick up
10   on the fact that there's something wrong and call for an
11   ambulance immediately.
```

This is practice in dealing with emergency situations is in line with the FCDC policy on Emergency Health Care (Section 10) that states:

AJONES 0080

a. **Security**

All detainees sent to the emergency room, will be assigned a certified law enforcement officer or a part-time certified officer to stay with the patient for the duration.

** **In life threating emergencies (or those perceived) the senior officer can escort an inmate to the emergency room. (Any retaliation for these type of transports WILL be reported to the jail administrator/assistant jail administrator)**

Having been a medical director at several jails and prisons, it is my opinion that Dr. Stewart fulfilled his duties as medical director of FCDC as outlined by his contract, and that no act of omission or commission on his part caused the unfortunate death of Mr. Jones.

### References

1. Clin Orthop Relat Res 2009 Feb; 467(2): 339-347.

### Qualifications

I am a licensed medical doctor who graduated from the University of South Alabama College of Medicine in 1996. I completed my residency in Family Practice in 1999 where I served as Chief Resident during my final year. I have worked exclusively in corrections since 2005. I have served as the medical director for Davidson County Sheriff's Office (Nashville, TN), Montgomery County Jail (Clarksville, TN), Williamson County Jail (Franklin, TN), and Rutherford County Work Release Center (Murfreesboro, TN). Currently, I am the Patient Safety Officer and Medical Director of Care Management for Wellpath, LLC. As part of my duties and responsibilities, I develop, review, and implement policies and procedures for medical staff to administer healthcare services to patients in correctional settings across the country. I am licensed to practice medicine in a number of states including Tennessee, Kentucky, Arkansas, Kansas, Nebraska, Alabama, Georgia, Florida, New York, Pennsylvania, California, New Jersey, Virginia, Illinois, Oklahoma, New Mexico, Texas, North Carolina, Michigan, Ohio, and Wyoming. I hold the title of Certified Correctional Healthcare Provider from the National Commission on Correctional Healthcare.

Memberships in professional societies include the American Medical Association, American Academy of Family Practice, Society of Correctional Physicians, National Commission on Correctional Healthcare, and the Academy of Correctional Health Professionals.

I have published an article in a correctional journal regarding a medical mission trip to Honduras (CorrDocs Volume 14, 2:7, 11 (2011)).

Based on my training, education, and experience, I am qualified as an expert in this case.

**AJONES 0081**

## Previous Cases

I, Dr. Grady Judson Bazzel, have testified as an expert witness at trial for the following:

*Finn v. Adams* Case No. 1:10-cv-16
*Carter v. McNaughton, et al* Case Number 1:15-CV-37
*Hartman v. Angelina County, et al* 9:20-cv-00097

I have testified by deposition in the following cases:

*Jordan v. Southern Health Partners et al* Case Number 04CIV18-2457
*Bramble, et al v. Southern Health Partners, et al* Case No. 2:10-CV-183
*Sharon Honaker/Brian Raddabaugh v. Prime Care, et al* Case No. 11-C-2300
*Salyers v. Federal Bureau of Prisons, et al* Case No. 13-CV-00109
*Horn v. City of Covington, et al* Case No. 2:14-CV-00073-DLB-CJS
*Zenoski v IMS, et al* Case No. 2018-CV-2138
*Simmons v. SCDC* Case No. 2019-CP-34-00391
*Bland v. Johnson, et al* Case No. 1:20-cv-01981-BHH-SVH
*Seabrook v. City of North Charleston, et al* 2:20-cv-03093-RMG-MGB
*Hartman v. Angelina County, et al* 9:20-cv-00097
*Oliver, et al. v. Pemiscot County, et al.* Case No: 19-CV-00137 (SNLJ)
*Reid (Furtick) v. SCDC, et al.* Case No. 2:21-cv-03090-JMC-MGB

## Compensation

My fees for my time are $400 per hour for record review and research, $2500 per day to attend depositions, and $3,500 per day (plus reasonable expenses) to provide testimony at trial.

Respectfully submitted,

Grady J. Bazzel, MD, CCHP

**AJONES 0082**