IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**SANDRA JONES, Personal Representative of**
**the Estate of Antonio L. Jones, Deceased**                             **PLAINTIFF**

VS.                                    NO.  4:21-cv-444-BRW

**FAULKER COUNTY, ARKANSAS;**
**DR. GARRY STEWART, M.D., Individually,**
**KAREN GRANT, Individually,**
**and LEANNE DIXON, Individually**                                       **DEFENDANTS**

### STATEMENT OF INDISPUTABLE MATERIAL FACTS
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1.  On the morning of August 8, 2019, the Plaintiff's decedent, Antonio Jones, was picked up from the Pope County jail, where he had been incarcerated for several hours since his arrest by Pope County on a felony charge of failure to appear. Ex. 1, Huffman Affidavit.

2.  Antonio Jones booked into the Faulkner County Detention Center (FCDC) on August 8, 2019, where he was dressed out into a jail uniform and provided all jail-issued property.  He also had his mugshot, fingerprints, and other relevant personal information.  Ex. 1, Huffman Affidavit.

3.  Antonio Jones appeared to be in fine health to all who encountered him on August 8, 2019, until after 3 p.m.  Ex. 1, Huffman Affidavit.

4.  At around 3:15 p.m. on August 8, 2019, medical assistant Leanne Dixon was taking some paperwork from the jail medical clinic to the booking area of the jail as a normal part of her duties duties when I noticed a detainee, who was identified to her as Antonio Jones, sitting on the bench.  Dixon had never met or encountered Mr. Jones before that moment.  Ex. 3, Dixon Affidavit.

5.  When Dixon noticed Mr. Jones sitting on the bench (he was sitting up and was not hunched over), she asked Officer Thomas Samanich what was going on and he told Dixon that he was not sure, but was about to take the detainee's vital signs.  Ex. 3, Dixon Affidavit.

6.  Dixon did not think that detainee Jones's condition required immediate transport to the emergency room or similar emergency care at the point of her first and only encounter with him.

1

Ex. 3, Dixon Affidavit.

7.     At about 3:19 p.m., while Officer Samanich was taking detainee Jones's vital signs, Dixon called jail nurse Karen Grant from her cell phone and told Grant that the detainee was shaking (Dixon observed some shaking in his arms) and sweating and that his eyes were really red. Dixon also Grant her that Office Samanich was taking his vital signs. Nurse Grant was concerned about a possible diabetic issue, so she told Dixon to make sure that his blood sugar was taken and to call her back when they had vitals. Ex. 2 & 3, Grant & Dixon Affidavit.

8.     During their initial conversation, Dixon also told nurse Grant that detainee Jones was fully coherent and answering questions appropriately. Neither Dixon nor anyone else ever told Grant that they thought he had taken anything, including drugs, which they always do if they have such a suspicion. This was because , on more than one occasion, they asked Mr. Jones whether he had taken anything and he denied taking any drugs or being under the influence of any drugs or alcohol. Ex. 2 & 3, Grant & Dixon Affidavit.

9.     After initially speaking with Nurse Grant about detainee Jones, Dixon assisted Officer Samanich with obtaining vital signs. Ex. 3, Dixon Affidavit.

10.    Officer Samanich and Dixon asked Mr. Jones - who was fully coherent and responding to their questions appropriately at that time - whether he had done or ingested any drugs and he told them no, that he had not; Dixon believed him. Ex. 3, Dixon Affidavit.

11.    Because detainee Jones was shaking and because Dixon and Samanich were using an automatic cuff that tolerated very little movement, they could not get a blood pressure reading at that time. They did get a blood glucose reading, which was in the mid 80s, a patently normal reading. Ex. 2 & 3, Grant & Dixon Affidavit.

12.    At 3:23 p.m., Dixon called Nurse Grant back and conveyed Jones's blood sugar reading. She also told Grant that they had been unable to get a blood pressure reading. Ex. 2 & 3, Grant & Dixon Affidavit.

13.    At that time (3:23 p.m. or later), Nurse Grant told Dixon to begin a medical watch

on detainee Jones - which means placing him on the booking bench, in full view of numerous officers, to be checked on every 15 minutes and to have his vital signs (blood pressure, pulse, respiration, pulse ox, temperature) taken on an hourly schedule  - and to report back any changes in condition or abnormal readings.  Ex. 2 & 3, Grant & Dixon Affidavit.

14. The officers have "automatic" instruments for taking vital sign readings, where necessary (respiration, for instance, is just counting breaths), with instructions on the instruments themselves (e.g., the blood pressure cuff) or the case in which it was held (e.g., tympanic thermometer) and "normal range" charts were also available. Ex. 2, Grant Affidavit.

15. Dixon conveyed Nurse Grant's instructions to Officer Samanich and he began the medical watch.  Ex. 3, Dixon Affidavit.

16. Dixon left the booking area at that time and went back to the medical clinic, where Dixon repeated, in person, what she had told Nurse Grant on the phone.  Dixon also confirmed that Jones had, in fact, been placed on medical watch and was being checked on every fifteen minutes and that the officers had expressed understanding that they were to take his vital signs on an hourly schedule and were to report any problems.  Dixon left the facility only a short time later when her shift ended. She received no further information about Mr. Jones or his situation until much later, when she was informed that he had passed away.  She was shocked when she heard the news.  Ex. 2 & 3, Grant & Dixon Affidavit.

17. After speaking with Dixon in person only a short time after they had their initial phone call about detainee Jones's presentation and Grant's decision to place him on medical watch, nurse Grant heard nothing further until the officers called her with new vital sign readings sometime around 4:30-4:45 p.m. They reported that Mr. Jones blood pressure was 103/85 and that his pulse oximetry (blood oxygen saturation level) was in the 90s, both of which were patently normal, if not excellent, readings (the fact that they took a successful BP was also noteworthy to Grant, as it indicated that his shaking might have dissipated since the initial report).  Ex. 2, Grant Affidavit.

18. After receiving the normal vital sign readings, Grant  asked what else was going on

and the officer(s) told her that he was still sweating and shaking (which indicated to Grant that his overall condition was essentially unchanged), but mentioned nothing else. Ex. 2, Grant Affidavit.

19.     After the call regarding Jones's second/normal vital sign readings, Grant received no further information until shortly (i.e., a minute or two, she recorded the time as 4:59 p.m.) before 5 p.m. when Officer Calene Scott called her and told her that detainee Jones's nose was bleeding. Grant asked him whether it was "trickling" or "gushing" blood (minor bloody noses occur frequently in the jail for a variety of reasons). Scott told Grant that the detainee was grunting and was throwing up and bleeding out of his nose and asked Grant to come to booking. Grant told them to get him over a trashcan (she understood him to be conscious and vomiting at that point) and told them that she was not the nurse on call, but she was I was coming down to booking immediately.  Ex. 2, Grant Affidavit.

20.     When Officer Scott asked Grant to come to booking, she immediately headed that way. While the medical clinic is only a short distance from the booking area (probably 40 yards or so), Grant had to go through five locked doors, which requires an officer in the control room to "buzz" her through each time. Additionally, she was walking with a cane at that point due to some health issues of her own. Nevertheless, she arrived in 2-3 minutes (she recorded the time as 5:03). Ex. 2, Grant Affidavit.

21.     When Grant arrived in the booking area, she saw Officer Homan attempting to rouse detainee Jones with an ammonia capsule and immediately instructed the officer at the desk to call 911. She  also immediately began examining him and noted that Jones's pupils were fixed and dilated and that he had blood coming out of his left nostril and the right side of his mouth. His skin was cool and clammy to the touch (which made sense in light of the report of sweating, although his clothing was not wet or even damp) and he had no pulse, at least that she could feel. Ex. 2, Grant Affidavit.

22.     Grant asked the officers to place Mr. Jones on the floor and begin CPR and they immediately followed her instructions. She then instructed them to get the AED, but it advised "no

shock" so we were unable to use it at that time.  He was also quickly given Narcan, with no effect.  CPR was continued until the fire department and EMS arrived and they continued care until Jones was taken away from the jail.  Ex. 2, Grant Affidavit.

23. From the time she first heard about detainee Jones and his situation, at or shortly before 3:30 p.m, until she arrived in booking just a minute or two after 5 p.m., no officer or employee of the jail (or anyone else) ever mentioned to nurse Grant that they thought detainee Jones needed to be taken to the emergency room or otherwise provided emergency medical care.  Ex. 2, Grant Affidavit.

24. Officers regularly called 911 without contacting the nurse first, but no one did that in Jones case because no one perceived an emergency until around the time Grant arrived in booking just after 5 p.m.   Even if someone did perceive an emergency, they did not notify nurse Grant. Ex. 1 & 2, Huffman & Grant Affidavits.

25. Prior to her conversation with Officer Scott just a minute or two before 5 p.m., no one had asked nurse Grant to come to the booking area to see detainee Jones in person.  Officers are generally not shy about asking me to come to see detainees in person.  Ex. 2, Grant Affidavit.

26. After his death, Antonio Jones's remains were the subject of an autopsy, which determined that his death was caused by his ingestion of a plastic baggie containing a large amount of methamphetamine, the toxicity of which was the cause of his death.  Ex. 1, Huffman Affidavit., pp. 8-14.

27. As the Sheriff of Faulkner County, Tim Ryals manages a large department of county government, including a patrol division, a criminal investigation division, a civil division, and a detention center.  Ex. 1, Huffman Affidavit.

28. In light of the size of the department described above, Sheriff Ryals necessarily delegates responsibility for most day-to-day activities to subordinate officers through a chain of command in each division.  Those officers are expected to perform those day-to-day tasks pursuant to policies he implemented for the department.  This chain of command, in addition to other

mechanisms like camera systems, post-incident investigations, and other mechanisms, also provides for the comprehensive supervision of jail employees.  Ex. 1, Huffman Affidavit.

29.	Jail staff at the Faulkner County jail is trained under a comprehensive training system that meets or exceeds the requirements of state law.  This training includes jail standards training, medical and emergency response training, and training in the policies of the jail.  Ex. 1, Huffman Affidavit.

30.	Faulkner County had appropriate policies in place to govern the provision of medical care to detainees at the time of Antonio Jones's incarceration in August of 2019.  Ex. 1, Huffman Affidavit, pp. 15-25.

31.	Other than insurance related to the operation of their vehicles and/or homeowner's insurance (neither of which are applicable to this case), neither Karen Grant nor Leanne Dixon has any insurance coverage for negligence or negligent conduct of any kind, including but not limited ot coverage for medical negligence/malpractice.  Further, while Faulkner County is (and has been, for many years) a member of the Association of Arkansas Counties Risk Management Fund, that membership provides no coverage for negligence or negligent conduct of any kind.  Ex. 1-4.

Respectfully submitted,

Faulkner County, Arkansas, Dr. Garry Stewart, M.D., Karen Grant, and Leanne Dixon,
*Defendants*

JASON OWENS LAW FIRM, P.A.
**Mailing Address:** P.O. Box 850
Conway, Arkansas 72033-0850
**Physical Address:** 1023 Main Street, Suite 204
Conway, Arkansas 72032
Telephone: (501) 764-4334
Telefax: (501) 764-9173

email: owens@jowenslawfirm.com

By:    Jason E. Owens
     Jason E. Owens, #2003003

## CERTIFICATE OF SERVICE

 I hereby certify that on the 27th day of October, 2022, I presented the foregoing to the Clerk of the Court for filing and uploading to the Arkansas Circuit Courts' Electronic Filing System, which provides electronic notice of filing to all counsel of record.

       Jason E. Owens
       Jason E. Owens