**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**SANDRA JONES, Personal Representative of**
**the Estate of Antonio L. Jones, Deceased**                              **PLAINTIFF**

**VS.**                                    **NO.  4:21-cv-444-BRW**

**FAULKER COUNTY, ARKANSAS;**
**DR. GARRY STEWART, M.D., Individually,**
**KAREN GRANT, Individually,**
**and LEANNE DIXON, Individually**                                    **DEFENDANTS**

<u>**28 U.S.C.A. § 1746 AFFIDAVIT**</u>

STATE OF ARKANSAS          )
                           )     ss:
COUNTY OF FAULKNER         )

Comes now Capt. Scott Huffman, and states, upon oath and on personal knowledge (except where indicated), the following:

1.      I am a Captain with the Faulkner County Sheriff's Department, where I serve as the jail administrator (I worked in the jail, but held a different position, in 2019).

2.      As the Sheriff of Faulkner County, Tim Ryals manages a large department of county government, including a patrol division, a criminal investigation division, a civil division, and a detention center.

3.      In light of the size of the department described above, Sheriff Ryals necessarily delegates responsibility for most day-to-day activities to subordinate officers through a chain of command in each division.  Those officers are expected to perform those day-to-day tasks pursuant to policies he implemented for the department.  This chain of command, in addition to other mechanisms like camera systems, post-incident investigations, and other mechanisms, also provides

1                    **Exhibit 1**

for the comprehensive supervision of jail employees.

4.      Jail staff at the Faulkner County jail is trained under a comprehensive training system that meets or exceeds the requirements of state law. This training includes jail standards training, medical and emergency response training, and training in the policies of the jail.

5.      As a Captain and jail administrator, I am a custodian of the records of the Faulkner County jail. Attached hereto are true and correct[1] copies of various records from and policies of the jail. These are regularly kept in the ordinary course business at the jail. The records attached are as follows:

> a.      Relevant jail and medical records from the Faulkner County jail related to Antonio Jones's August, 2019 incarceration and the investigation that followed;
>
> b.      Relevant policies of the Faulkner County jail; and
>
> c.      Relevant training materials from training related to the jail staff's role in the provision of medical care in the jail.

6.      Having worked in the jail for many years, now as a jail administrator, I am aware of a piece of paper that once existed in the jail that indicated that approval from the nurse was necessary before sending a detainee to the emergency room. This statement was not a policy of the jail and spoke only to non-emergency situations, anyway (in other words, where it was practicable to get approval). We trained officers to call 911 in emergency situations and, on any number of occasions, I know that jail staff has called 911 or sent a detainee to the emergency room before alerting the medical staff. None of those officers was disciplined in any way; to the contrary, they were thanked.

---

[1] My attorney has hand-numbered the attached pages for ease of use.

7.    Faulkner County is (and has been, for many years) a member of the Association of Arkansas Counties Risk Management Fund, but that membership provides no coverage for negligence or negligent conduct of any kind, including but not limited to medical negligence/malpractice.

### 28 U.S.C.A. § 1746 Affidavit Oath

I declare under penalty of perjury, upon oath and on personal knowledge (except where indicated), under the laws of the United States of America, that the foregoing is true and correct.

Capt. Scott Huffman

Date

3

# FAULKNER COUNTY SHERIFFS OFFICE
801 LOCUST STREET
CONWAY, AR. 72034-
Phone: (501) 450-4914  Fax: (501) 450-4916
(*RELEASE*)

| Booking# | Jacket# |
|---|---|
| 59531032 | 240767 |
| Cell# | Locker# |
| B17 | 1 |

**JONES, ANTONIO LAMONT**
338 S HIGHWAY 365
REDFIELD, AR.  72132-
(501) 200-2407   Cell#: (  )   -

Social Security #

D.L.#: AR/999052066     Date Of Birth

Race: **B**      Sex: **M**
Hair: **BLK**    Eye: **BRO**
Mustache:    Glasses:
Religion:
Country: **USA**
Features:
Aka: **JONES, ANTONIO**
Employer:
Kin Name:
Address:
Phoned Who:
Intake Date: 8/8/2019
Arrest Date: 8/8/2019

Height: **511**
Complexion:
Dominant Hand:
Marital Status:
Diet Restriction:

Weight: **295**
Hispanic: **U**
Military Agency:
Place Of Birth:
Citizen: **Y**

Mittimus #: 0
Length:
Beard:
Gang: **NONE**
Escape Risk: **N**
# Of Children:

Work Phone: (  )   -
Relationship:

SID#: **3253735**
FBI#:

Time: **10:09**
Time: **08:12**

Phone #: (  )   -          Case/OCA#:
Intake Officer: **1236 - SAMANICH, THOMAS**
Officer: **HEAD**
Searching Officer: **1236 - SAMANICH, THOMAS**

Arresting Agency: **FCSO**
Bond Description: **NO BOND**
Vehicle Towed By:
CR#:
Holders:
Trustee:       Mental Illness:
Release Date: 8/8/2019
Released (ror/to): **SAMANICH**
Bond Out Type:
Transporting Officer:
Inmate

Transporting Agency: **HEAD/FCSO**

Location: POPE CO
Bond Amt: **0**

Agency Responsible: FCSO - FAULKNER COUNTY SO

Prison #:          Inmate Class: **3**          Suicide Watch:

Sex Offender:       Weekender:          Violent:
Time: **17:30**          Officer ID: **1236-SAMANICH, THOMAS**
Released To: **FCSO**              Out Weight:      Total Bookings: **1**
Disposition: **DUE TO MEDICAL PER CAPTAIN**   Bond By:

C/O

| CHARGE | DESCRIPTION | TERMS | BOND | WARRANT | CT | DATE | TIME | DEPT |
|---|---|---|---|---|---|---|---|---|
| 5-26-401 | FAILURE TO PAY CHILD-SUPPORT   [1 | NO BOND | 0 | 23CI-19354 | | / / | | FCSO |




# Suspect Rap Sheet



| | |
|---|---|
| ATN: | FLK004116882 |
| SID: | |
| Last Name: | JONES |
| First Name: | ANTONIO |
| Middle Name: | |
| DOB: | |
| Race: | B |
| Sex: | M |
| Height: | 511 |
| Weight | 295 |
| Build: | |
| Eye Color: | BRO |
| Hair Color: | BLK |
| Hair Length: | |
| FBI: | |
| SSN: | |
| Drivers License: | |
| Gang Affliliation: | |

ScarType:

Scar Location:

Mark Location:

Tattoo Type:

Tattoo Location:

Tattoo Literal:

Mole Location:

Deformities:

| | |
|---|---|
| Street Number: | |
| Street Name: | |
| Apartment Number | |
| Rural Route: | |
| Rural Route Box: | |
| City: | |
| State: | AR |
| Zip: | 72034 |



ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2019-Feb-13 09:53:26
23CR-19-206
C20D05 : 3 Pages

IN THE  FAULKNER CIRCUIT COURT

**STATE OF ARKANSAS**

PLAINTIFF

V.

NO. CR

**ANTONIO L JONES**

DEFENDANT

6720 Dollarway Rd Apt 24
White Hall, AR  71602

DOB
RACE   B
SEX   Male

### FELONY INFORMATION

Carol Crews, Prosecuting Attorney of the Twentieth Judicial District of Arkansas, in the name and by the authority, and on behalf of the State of Arkansas charges **Antonio L Jones** with the crime(s) of Nonsupport (>10,000 <25,000) as follows:

**COUNT 1: Nonsupport (>10,000 <25,000) ARK. CODE ANN. § 5-26-401.** The said defendant in FAULKNER COUNTY, did unlawfully and feloniously on or about February 29, 2016 and December 12, 2018,  without just cause, fail to provide support to his legitimate children who are less than 18 years old and that he has left or remains without the State of Arkansas for more than thirty (30) days while a current duty of support is unpaid, said support being more than $10,000 but less than $25,000,

Thereby committing the offense of Nonsupport (>10,000 <25,000), said offense being a CLASS C FELONY against the peace and dignity of the State of Arkansas.

Carol Crews
PROSECUTING ATTORNEY

By _Cortney Kennedy_

### TO THE CLERK OF THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS

Based upon the sworn testimony of Rowena Freeman, OCSE, and other materials presented therewith, I am satisfied that there is probable cause to believe that the offense alleged in the above Felony Information was committed by the person above described and that there exist probable cause for the issuance of a Warrant for Arrest.

Dated this ____ day of _Febry 15, 2019_, 20___.

_____
JUDGE

3

(STAPLE HERE)

LEAVE BLANK

FLK004116882

STATE USAGE

NFF SECOND
SUBMISSION

FD-249 (Rev. 3-1-10)

STATE USAGE

APPROXIMATE CLASS

AMPUTATION

SCAR

LAST NAME, FIRST NAME, MIDDLE NAME  SUFFIX

JONES, ANTONIO

SIGNATURE OF PERSON FINGERPRINTED

SOCIAL SECURITY NO

LEAVE BLANK

ALIASES/MAIDEN
LAST NAME, FIRST NAME, MIDDLE NAME, SUFFIX

| FBI NO. | STATE IDENTIFICATION NO | DATE OF BIRTH   MM   DD   YY | SEX  M | RACE  B | HEIGHT  511 | WEIGHT  295 | EYES  BRO | HAIR  BLK |



1. R. THUMB

2. R. INDEX

3. R. MIDDLE

4. R. RING

5. R. LITTLE

PT  50X50G4  4000      #0011    14:59:59

LXMRK    #000000     20150808-15:13

EFT FOUR FINGERS TAKEN SIMULTANEOUSLY

R. THUMB

RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

4

# ARKANSAS ARREST / DISPOSITION REPORT

REVISED 8/2017

| Arresting Agency Name: | | Incident Report #: | 1900 3845 |
|---|---|---|---|

## DEFENDANT INFORMATION

| Last Name: Jones | First Name: Antonio | Middle Name: |
|---|---|---|
| Aliases: | | Phone #: |

| Street Address: 336 S Hwy 365 | City: Redfield | State: AR | Zip Code: 72132 |
|---|---|---|---|

| Central System #: | FBI #: | SID#(s): |
|---|---|---|

| Social Security #: | Drivers License/ID #: | State Issued: |
|---|---|---|

| Sex: (MALE) FEMALE | Race: American Indian/Alaskan Native   Asian/Pacific Islander   (Black)   Unknown   White |
|---|---|

| Date of Birth: | Place of Birth: Little Rock   AR   USA |
|---|---|
| Month  Day  Year | City                                State           Country |

| Hair Color: Black | Eye Color: Brown | Height: 5'11 | Weight: 295 |
|---|---|---|---|

| Scars/Marks/Tattoos: Scar on right elbow | | Complexion: Medium | Build: Medium |
|---|---|---|---|

| Employer's Business Name: | | Occupation: | | Phone #: | |
|---|---|---|---|---|---|
| Street Address: | City: | | State: | | Zip Code: |

| Nearest Relative: (First & Last Name) Sandra Jones | Relationship: Mother | Phone #: |
|---|---|---|
| Street Address: | City: | State: | Zip Code: |

## ARREST INFORMATION

| Place of Arrest: (Street Address) Pike Co. | City: | State: | Zip Code: |
|---|---|---|---|

| Arresting Officer(s): First & Last Name  A. Head | | Badge/ID #: 322 | Agency: FCSO |
|---|---|---|---|

| Arrest Date: 08/08/2019 | Arrest Time: 0912 | Bail Amount: No bond | Arrestee received from another AGENCY: | (YES)   NO |
|---|---|---|---|---|

| Classification Felony/Misdemeanor | Warrant # | State Criminal Code # | Charge Description | Disposition | Date (Month, Day, Year) |
|---|---|---|---|---|---|
| Felony | 22JI-19-354 | | None Supprt | Jailed | 08/07/2019 |
| | | | | | |
| | | | | | |
| | | | | | |

## FACTS OF ARREST (Explain in Detail)

No marks, No scars, No bruises upon intake

∅ Antonio Jones

mother.

sister

Erica Jones

phone

| Court Date: | Court Hearing Case #: |
|---|---|

5

# FAULKNER COUNTY DETENTION CENTER

FCDC 2010 - 43

## Suicide and Medical Watch Log

Name of Inmate: Jones, Antonio  Cell: B   Date: 8/8/19.

Vitals once an hour

Type of Watch:  Suicide Watch ☐   Medical Watch ☑

*Area under observation in process (specify) _____

| TIME | REMARKS | BADGE AND INITIAL |
|------|---------|-------------------|
| 1525 | Put on med watch per Nurse Grant. Shaking and sweating | 381 TS. |
| 1530 | On Bench Shaking | 381 TS |
| 1545 | On Bench shake | 332 RH |
| 1600 | on bench | 332 RH |
| 1615 | on bench grunting | 332 RH |
| 1630 | on bench grunting | 332 RH |
| 1645 | 10/8/85/91 Vitals | 832 BH |
| 1700 | Grunting on the bench | 332 RH |
|  | Sgt Scott called Nurse Grant after | 304 KB |
|  | he was informed that Detainee |  |
|  | Jones was salavating heavily she |  |
|  | stated that he may have taken |  |
|  | something and to keep him on |  |
|  | med watch b/c she'd ⬛⬛⬛ coming |  |
|  | up since she wasn't on call |  |

___

**Medical Watch Protocol**
1. Obtain permission from the nurse.
2. Closely Monitor.
3. Check every 15 minutes.
4. Release when informed by nurse.
5. Make sure you place this report in the medical box by the end of your shift.
6. Follow medical directive with no deviation.

**Suicide Watch Protocol**
1. Make sure you follow the entire protocol.

Use a new record for each day beginning with the first time for watch

Page 1

6



**Arkansas State Crime Laboratory**
P.O. Box 8500
3 Natural Resources Drive
Little Rock, Arkansas 72215

Laboratory Services
(501) 227-5747

Medical Examiner
(501) 227-5936

## Medical Examiner Case Feedback

Investigating Officer/Agency/Address

Page 1 of 1

Jessica Thorn
Faulkner County Coroner
Pat Moore
P.O. Box 1698
Conway, AR 72033
Decedent:

Laboratory Case Number: 2019-018703
Agency Case Number  AR-6949-2019
ME Case Number  0876-19

Antonio  Jones

*This is not a report of laboratory analysis. The information contained in this letter is preliminary and may change.*
*The information listed below represents the opinion of the undersigned Medical Examiner given the facts known at the time*

*Date of letter: 08/09/2019*

A full autopsy has been conducted on the body of the above-noted individual.

**Cause of Death:**
The cause of death is pending.

**Manner of Death:**
The manner of death is pending.

**Comments:**
No injuries.  Suspect drug OD; plastic baggie found in stomach contents.  Rapisd urine screen positive for
methamphetamine, amphetamine, and benzodiazepines.  This will have to be confirmed by formal toxicology testing.

**Additional information necessary to complete the case:**

**Charles P. Kokes, M.D., Chief Medical Examiner**
*charles.kokes@crimelab.arkansas.gov*

7



# State Crime Laboratory

P.O. Box 8500
3 Natural Resources Drive
Little Rock, Arkansas 72215



Medical Examiner
(501) 227-5936

## Medical Examiner Division

| | | | |
|---|---|---|---|
| **Case No:** | 2019-018703 / ME-0876-19 | **Date of Examination:** | August 09, 2019 |
| **Name:** | JONES, Antonio | | |
| **Age:** | 33 Years | **Sex:** Male | |
| **County:** | Faulkner | | |

## CONCLUSIONS

**CAUSE OF DEATH:**  Methamphetamine Intoxication

**MANNER OF DEATH:**  Accident

*[signature]*  October 16, 2019

**Charles P. Kokes, M.D.**
Chief Medical Examiner – Pathologist of Record

*[signature]*

**Adam F. Craig, M.D.**
Associate Medical Examiner - Reviewer

*[signature]*

**Frank J. Peretti, M.D.**
Associate Medical Examiner - Reviewer

7 Page Report/Page 1                    **ASCL Official Copy - Do Not Duplicate**

8

NAME: JONES, Antonio

NO: 0876-19

## EXTERNAL DESCRIPTION:

The body was that of a well-developed, obese black male, clad in gray and white striped short-sleeved overalls. At the time of initial examination, this garment had been unfastened on the front of the trunk, exposing the anterior chest and abdomen. The right sleeve had been cut, as well as the left pant leg. No other clothing was on or with the body. The body weighed 295 pounds, measured 71 inches in length and appeared consistent with the stated age of 33 years. Body temperature was cool. Rigor mortis was fully and uniformly developed in the extremities. Fixed purple-red lividity was present on posterior body surfaces, except in areas exposed to pressure. The scalp was covered with black hair measuring up to 1/4 inch in maximum length. A beard and mustache were present. The irides were brown and the corneae were clear. The conjunctivae and sclerae showed no petechial hemorrhages or other significant changes. The external ears were unremarkable. The nasal passages and mouth were clear. The teeth were natural and in good condition. The neck was without external evidence of antemortem injury. The chest was normally developed and generally symmetric, with no evidence of acute antemortem injury. The abdomen was moderately protuberant, but soft. It showed no evidence of acute antemortem injury. The external genitalia were those of a normal adult male with bilaterally descended testes. There was no evidence of antemortem injury involving the genital region. The lower extremities were normally developed and generally symmetric, with no evidence of acute antemortem injury. The ankles and feet were unremarkable. The upper extremities were normally developed and generally symmetric, with no evidence of acute antemortem injury. Tattoos were not present on the upper extremities. No needle tracks or wrist scars were present. The hands and nails were unremarkable. Examination of posterior body surfaces did not reveal evidence of injury involving the back or buttocks. The anus was without evidence of injury or abnormality.

## EVIDENCE OF MEDICAL ATTENTION:

An endotracheal tube was inserted in the mouth. Defibrillator pads were present on the upper anterior right chest and lower anterolateral left chest. ECG pads were present on the distal anterior right upper arm and both lower legs. An intraosseous trocar was inserted in the proximal anterior left lower leg. A gauze and tape bandage covered a fresh needle puncture site in the right antecubital fossa.

## EVIDENCE OF OLD INJURY:

None present.

## EVIDENCE OF RECENT INJURY:

None present.

## INTERNAL EXAMINATION

The subcutaneous fat layer measured up to 2 1/2 inches. No adhesions or abnormal fluid collections were present pleural or peritoneal cavities. Petechial hemorrhages were not present

ASCL Official Copy - Do Not Duplicate

9

NAME: JONES, Antonio                                                     NO: 0876-19

on the thoracic organs.  All body organs were present in normal anatomic position.  There was no internal evidence of antemortem blunt force or penetrating injury to the thoracoabdominal region.  A resuscitation-related fracture of the lower sternum was present.  This was associated with minimal surrounding soft tissue hemorrhage.

## CARDIOVASCULAR SYSTEM:

Pericardial surfaces were smooth and intact.  The pericardial sac contained 5 mL of yellow-tinged, watery fluid and there were no adhesions.  The heart weighed 480 g, and appeared mildly enlarged in overall size.  It otherwise appeared normal in shape and configuration.  The coronary arteries arose normally and followed the usual course.  Serial sectioning of the coronary arteries revealed no significant atherosclerotic changes in the left main coronary artery, the left circumflex artery, and the right coronary artery.  A single focus of 10 to 20% atherosclerotic narrowing was present in the proximal left anterior descending artery.  Acute thrombus formation was not present in these vessels.  The cardiac chambers were normal in size.  Endocardial surfaces were smooth and intact.  The cardiac valves were normal in size and morphology.  Cut surfaces of the myocardium displayed uniform brown-red coloration, with no gross evidence of underlying pathologic change.  The atrial and ventricular septa were intact.  The aorta and its major branches arose normally, followed the usual course, and were free of atherosclerosis and other pathologic changes.  The vena cava and its major tributaries returned to the heart in the usual distribution and were free of abnormalities.

## RESPIRATORY SYSTEM:

Pleural surfaces of both lungs were smooth and intact.  The pulmonary arteries were normally developed, patent, and without thromboemboli or other abnormalities.  The upper and lower airways were clear of debris and foreign material.  Mucosal surfaces were smooth and of normal coloration.  Hilar lymph nodes were non-prominent.  The left lung weighed 635 g and the right lung weighed 780 g.  Cut surfaces of both lungs revealed diffuse dark purple-red congestion and watery edema present throughout all lobes, with no gross evidence of underlying disease.

## NECK:

Examination of deep neck structures, including strap muscles, thyroid gland, and large vessels, revealed no abnormalities, including hemorrhage.  The larynx and hyoid bone were intact.  The epiglottis and vocal cords were unremarkable.

## ALIMENTARY TRACT:

The tongue was without hemorrhage or other abnormalities.  The esophagus was lined by intact, gray-tan mucosa.  The stomach contained 100 mL of dark brown-green fluid and food material, along with a small, clear plastic baggie.  The baggie was opened at the time of initial examination and contained no gross residual material.  Serosal surfaces of the small and large bowel were intact and unremarkable.  The rectum and anus were without evidence of injury or abnormality. The appendix was present.

ASCL Official Copy – Do Not Duplicate

NAME: JONES, Antonio                                                                   NO: 0876-19

## LIVER AND PANCREAS:

The liver weighed 2035 g and was covered by an intact capsule. Cut surfaces were uniform brown-red, normally firm, and without focal changes. The gallbladder contained 15 mL of yellow-brown, mucoid bile and was lined by intact, velvety mucosa. The extrahepatic biliary tree was patent. Periportal lymph nodes were non-prominent. The pancreas was of normal size and displayed its usual lobulated gray-tan appearance both externally and on cut surface. The pancreatic ducts were patent. Peripancreatic lymph nodes were non-prominent.

## GENITOURINARY SYSTEM:

Each kidney weighed 170 g. Each was covered by an intact capsule which stripped away easily. Cortical surfaces of the kidneys were brown-red and smooth. Cut surfaces revealed brown-red cortex of normal thickness. There was good corticomedullary demarcation present. The calyces, pelves and ureters were unremarkable. The urinary bladder contained 50 mL of clear yellow urine and was lined by intact, gray-tan mucosa. The prostate was of normal size and appeared unremarkable on cut surface. The testes also were grossly unremarkable on cut surface.

## IMMUNOLOGIC SYSTEM:

The spleen weighed 130 g and was covered by an intact capsule. Cut surfaces were uniform dark purple-red, normally firm, and without focal changes. The white pulp was non-prominent.

## ENDOCRINE SYSTEM:

The pituitary, thyroid, and adrenal glands were free of obvious disease.

## MUSCULOSKELETAL SYSTEM:

Skeletal muscle generally displayed uniform pale red-tan coloration, with no focal changes present. No gross bone or joint abnormalities were present. The cervical, thoracic and lumbar spine were free of hemorrhage and other abnormalities.

## CENTRAL NERVOUS SYSTEM:

The scalp was free of hemorrhage and edema. The calvarium and basilar skull were intact. There was no epidural, subdural or subarachnoid hemorrhage present. The brain weighed 1600 g. The leptomeninges were thin and clear. The cerebral gyri were normally formed and showed no focal lesions. Structures at the base of the brain, including cranial nerves and major blood vessels, were intact and unremarkable. Serial coronal sections of the cerebral hemispheres revealed symmetry between anatomic structures of the left and right sides, with no focal changes present. Cut surfaces of the brainstem and cerebellum were unremarkable.

## HISTOLOGY:

Formalin fixed tissue samples were retained. No slides were processed.

**ASCL Official Copy - Do Not Duplicate**



NAME: JONES, Antonio                                                      NO: 0876-19

## RADIOLOGY:

Radiographs of the body were not taken prior to examination.

## IDENTIFICATION:

The body was received as identified by the Faulkner County Sheriff's Office.

## EVIDENCE:

Items retained for evidence included fingerprints, a blood matrix card, and the plastic baggie recovered from the stomach contents. The jumpsuit was returned to the agency.

## SPECIMENS:

Specimens retained for toxicology testing included peripheral blood, vitreous humor, urine, and stomach contents.

## WITNESSES:

No visitors from outside agencies were present during the examination.

7 Page Report/Page 5                                    ASCL Official Copy - Do Not Duplicate

12

NAME:  JONES, Antonio

NO: 0876-19

# LABORATORY RESULTS

**TOXICOLOGY:**

**Antonio Jones:**

Peripheral blood

    Volatile

| | |
|---|---|
| Acetone | not detected |
| Ethanol | not detected |
| Isopropanol | not detected |
| Methanol | not detected |

    Immunoassay

| | |
|---|---|
| Benzodiazepines | negative |
| Cannabinoids | negative |
| Cocaine | negative |
| Fentanyl | negative |
| Methadone | negative |
| Methamphetamines | positive |
| Opiates | negative |
| Oxycodone | negative |

    General Toxicology

| | | |
|---|---|---|
| Nicotine (GC-MS) | present | |
| Caffeine (GC-MS) | present | |
| Amphetamine (GC-MS) | present | |
| Methamphetamine (GC-MS) | 7.0 µg/mL | (± 0.9 µg/mL) |

Urine

    Immunoassay

| | |
|---|---|
| Amphetamines | positive |
| Barbiturates | negative |
| Benzodiazepines | negative |
| Cannabinoids | negative |
| Cocaine Metabolite | negative |
| Fentanyl | negative |
| Methadone | negative |
| Opiates | negative |
| Oxycodone | negative |
| PCP | negative |

*Confirmatory testing in urine has not been performed for the positive immunoassay drug class(es): Amphetamines.*

*Note  Reported measurement uncertainties define an interval having a level of confidence of at least 95%.*

ASCL Official Copy - Do Not Duplicate

13

NAME: JONES, Antonio

NO: 0876-19

## FINDINGS

I.     Obesity.

II.     Mild cardiomegaly (480 g).

III.     Mild atherosclerosis, left anterior descending coronary artery.

IV.     Bilateral pulmonary vascular congestion and edema.

V.     Small plastic bag in stomach contents.

## OPINION:

This 33-year-old black male, Antonio Jones, died of methamphetamine intoxication.

According to investigation, on the afternoon of 8/8/19 he was in custody at the Faulkner County Detention Center. It is assumed that he had been taken into custody that day, since he was taken from his cell at 3:00 PM to be fingerprinted. It was noted that he was severely shaking, and for that reason he could not be fingerprinted. The on-call nurse was notified and he was placed on medical watch. Over the next 90 minutes, he continued to shake. At around 4:45 PM, his vital signs were taken. His pulse was 91 and his blood pressure was 103/85. He continued to shake and grunt. At 5:00 PM, he was noted to be salivating heavily. At around 5:10 PM, he apparently collapsed and paramedics were called. Resuscitation efforts were started and continued for about a half hour. These efforts were unsuccessful and death was pronounced at 5:54 PM.

Autopsy examination did not reveal any external or internal evidence of antemortem injury. Exogenous obesity was noted, along with mild enlargement of the heart. Nonspecific vascular congestion and edema involved the lungs. Examination of the stomach contents revealed a small clear plastic bag. This bag was open when initially found, and contained no gross residual material. Toxicology testing revealed a lethal level of methamphetamine in blood, along with its metabolite amphetamine. Nicotine and caffeine were also present. Ethanol was not present.

It is likely that the bag recovered from the stomach had contained methamphetamine, and that he had swallowed the bag intentionally to avoid detection when taken into custody by law enforcement. The drug then leached out of the bag, causing overdose and death. Since the overdose was probably not intentional, the manner of death will be classified as accident.

## MANNER OF DEATH:     Accident

7 Page Report/Page 7

ASCL Official Copy - Do Not Duplicate



FCDC01/17P&P

## SECTION 010

## EMERGENCY HEALTH CARE

**POLICY:**      All perceived emergency medical situations shall receive immediate attention. Emergency medical situations will have priority over routine detention facility operations until the emergency is resolved.

**DEFINITION:**

Emergency Medical Situation:  Any perceived life or health threatening condition, including but not limited to; severe bleeding, unconsciousness, serious breathing difficulties, head injury, severe pain, suicide attempt, onset of unusual behavior, or severe burns.

**PROCEDURES:**

a.      Emergency Telephone Numbers:

   (1)      Detention Facility Nurse

   (2)      Hospital Emergency Rooms:

      (a)      Conway regional Hospital, Phone 501-450-2178

   f .      Ambulance Services:

      (a)      Conway regional hospital  Phone 501-450-2178

   Fire Department/EMT:

      (a)  _____ Phone 501-513-1378

c.      **Training**

   (1)      A complete first aid kit is kept in the control area, tower, and medical room. All officers are required to receive training in first aid, CPR, and emergency medical procedures.

   (2)      Staff members are aware that a need for emergency medical attention may arise at any time.

**Go Back To Index**

15

FCDC01/17P&P

d.   **Initial Response**

(1)   When a staff member discovers a detainee who is in need of emergency medical attention, first aid is applied immediately.

(2)   As soon as first aid is applied, the responding employee notifies the detention facility nurse.

(1) The emergency situation, the location and the condition of the patient.

(2) Requests help if needed.

(3) The detention officer will follow all instructions of the detention facility nurse.

a.   **Security**

All detainees sent to the emergency room, will be assigned a certified law enforcement officer or a part-time certified officer to stay with the patient for the duration.

**\*\*   In life threating emergencies (or those perceived) the senior officer can escort an inmate to the emergency room. (Any retaliation for these type of transports WILL be reported to the jail administrator/assistant jail administrator)**

g.   **Records**

(1)   The detention facility employee discovering the emergency completes an incident report.

(a)   If the patient is a detainee, the incident report is placed in the detainees jail file.

(b)   If the patient is an employee, the incident report is forwarded to the detention facility administrator.

(2)   The officer escorting a detainee to the emergency room requires the attending physician to provide written instructions for any follow-up health care.

(3)   The escorting officer returns all prescriptions and follow-up instructions to the shift supervisor on duty. The supervisor will ensure the medical administrator is notified and a copy placed in the medical box.

(4)   All detainee emergency health care records are placed in the detainee's medical file.

h.   **Aftercare:**  If the patient is a detainee, the detention facility staff complies strictly with the orders of the detention physician when the detainee is returned to the detention facility.

i.   **Annual Review:** This policy is reviewed at least annually by the detention facility administrator and designated staff members, and revised as needed.

**Go Back To Index**                                  **10.2**

16

FCDC01/17P&P

## SECTION 011
## DETAINEE SICK CALL

**POLICY:** Detainees shall be provided access to necessary health care through a routine sick call procedure. Sick call shall be conducted by a licensed medical professional. No employee or official of the county shall interfere with a detainee's access to sick call.

**DEFINITIONS:**

a.   **Health Care:** All health care, including medical, dental, and mental health care.

b.   **Detention Facility Nurse:** A licensed nurse having signed an agreement to conduct sick call and perform other services for the detention facility.

**PROCEDURES:**

(a)   **Staffing:** The detention facility nurse conducts sick call. The medical assistant can be present during sick call for female/male inmates.

b.   **Schedule:** Sick call is conducted according to a schedule established by the detention facility administrator and the detention facility nurse.

c.   **Requests**

    (1)   Detainee sick call requests must be written. The detention facility staff provides the medical care request form.

    (2)   Sick call requests should clearly state the nature of the problem. Requests must give the detainee's name and should be signed and dated.

d.   **Screening**

    (1)   The detention facility nurse collects all sick call requests prior to sick call. The detention facility nurse sees each detainee personally to determine the detainee's health care needs. Examinations are conducted in a private area away from other detainees.

    (2)   **The Detention Facility Nurse may:**

        (a)   Authorize non-prescription medications and treat detainees for minor problems not requiring a doctor's care.

        (b)   Refer more serious conditions to a doctor.

        (c)   Recommend referrals to other doctors, dentists and outside health care professionals.

**Go Back To Index**

11.1

17

FCDC01/17P&P

  (4)  In addition to conducting sick call, the detention facility nurse:

    a.  Keeps records of all sick call requests, the results of examinations and appointments, and prescribed medications.

    (b)  Refers health care appointments outside the detention facility.

    (c)  Reviews the findings of outside appointments, and informs the detention facility doctor of the results.

e.  **Staff Responsibilities**

  (1)  **Transportation**

    (a)  The nurse reviews the appointment calendar daily and arranges transportation to appointments.

    (b)  The detention facility nurse, may cancel appointments only in the event of an emergency.

    (c)  The appropriate doctor's office will be notified of any cancellations.

    (d)  The medical assistant will secure all prescriptions, examination results and the dates of   future appointments and returns them to the detention facility nurse.

    (e)  The nurse will arrange to have any prescriptions filled so the detainee can start taking prescribed medications without delay.

  (2)  **Security**

    (a)  The medical assistant is responsible for ensuring security during sick call and health care appointments.

    (b)  If a detainee is taken outside the detention facility for medical treatment, the medical assistant will do the transports and provide the security.

  (3)  **Dispensing Medications**

    (a)  Medications are kept in a locked cabinet and inventoried by each shift at the time of shift change.

    (b)  The corporal on shift dispenses all medication to detainees in accordance with prescription instructions or the instructions of the detention facility nurse. If the corporal is off, the senior officer will dispense medication.

    b.  Detainees are required to sign for all medications administered.

FCDC01/17P&P

## Medication Approval

We will no longer approve medication after hours Monday thru Thursday. All medications brought to the facility by detainees or family members during this time should be placed in the proper medical boxes and the medical staff will approved all medications upon the next business day.

All medications brought to the facility between the hours of 1630 on Fridays through 2200 on Sunday night (weekends) will be approved by the on call nurse via telephone conversation.

All mediations brought to the facility during a Faulkner County Observed Holiday will be approved by the on call nurse via telephone conversation.

All medications delivered by I.H.S Pharmacy or Baker Drugs have been pre-approved and should be placed on the med cart and medication administration cards prepared.

## Medication Dispensing Logs

Please be advised that new medication dispensing logs are made upon need for inmate medication refills and new prescriptions. New medical sheets will be started each time an inmate receives a blister pack of meds (either from the clinic, psychiatric facilities, other detention facilities, pharmacies, juvenile rehabilitation facilities, etc...). Please do not add the new number of medication to an old medical sheet from this point forward.

## Medication Administration

To ensure that the proper medications are administered to the proper detainee, please follow these simple rules:
1. Right detainee. Properly identify. Ask name and verify by arm band.
2. Right time. Verify medication time on record.
3. Right medicine. Check label on blister pack and compare to medication administration record.
4. Right dose. Administer the right amount of medication as identified on medication record and blister pack.
5. Right route. Use the prescribed method or medication administration.
6. Right documentation. Promptly and accurately document the medication administration, both the detainee and the officer should sign the form.

**Process:**
   Call the detainee to the medication administration area.
   Verify name on armband.
   Compare name on MAR (medication administration record) to armband.
   Compare name on armband to name on blister pack and MAR.
   Compare instructions and medication name on MAR and blister pack.
   Administer medications to detainee.
   Detainee and officer must both sign the MAR.

19

FCDC01/17P&P

## For Staff Referrals:

If it is an emergency situation, shift supervisors may obtain health care for a detainee by contacting the detention facility nurse prior to sick call.

1.  Records: All sick call requests, the results of all appointments and examinations, prescribed medications, receipts for medications administered, or any other information pertaining to health care are placed in the detainees medical record.

2.  Specific Prohibitions: Employees and county officials are prohibited from restricting a detainee's access to sick call.

3.  Annual Review: This policy is reviewed by the detention facility administrator and designated staff members at least annually, and revised as needed.

4.  All Medical Documentation: Please be aware that all medical paperwork is legal documentation. Therefore, no spaces should be left blank on any medical documentation from this point forward. This includes the following medical paperwork: Juvenile Intake Sheets, Adult Intake Sheets, Medical Request Forms, Medical Sheets (Medication Dispensing Log), Juvenile Medical Request Forms, No Harm Agreements, Vital Sign Logs, and Medical Observations.

**Go Back To Index**                    **11.4**

20

FCDC01/17P&P

## SECTION 021
## DETAINEE HEALTH CARE

**POLICY:** It is the policy of this detention facility to insure the healthcare services within the detention facility are adequate for the facility and managed in accordance with accepted health care policies and procedures. The detention facilty physician is the only physician that has medical authority in the detention center.

**PROCEDURES:**

a.   **Detainee Health Care Screening**

    (1)   A health care screening form shall be completed for every detainee booked into the detention facility. If special health care is needed, the Health Care Screening form will be reviewed as soon as possible by the detention facility nurse. This form shall contain but not be limited to:

        (a)   Current health assessment

        (b)   Medication currently being taken and special diet requirements

        (c)   Behavioral observations

        (d)   Notation of body deformities

        (e)   Detailed descriptions of bruises, cuts, needle marks

b.   **Prescribed Medications**

    (1)   All prescribed medications admitted into the detention facility must be approved by the detention facility nurse. Only approved medication will be dispensed in the detention facility.

    (2)   A medication log shall be maintained. All prescribed medications received for detainee use and dispensed within the detention facility shall be recorded on the log. Each entry must be initialed by the detainee receiving the medication and initialed by the employee making the entry.

    (3)   Each detainee must receive all the medication prescribed for him in the quantities set forth on the prescription label. The employee responsible for dispensing prescribed drugs must witness the detainee taking the medication.

    (4)   All controlled drugs shall be stored in the medical cabinet. Keys to that cabinet shall only be in the possession of the corporal. If the corporal is not on-duty, the senior officer will have the keys.

No one under the rank of lieutenant will be allowed to enter the medical department without nurse permission. The only exception to this is the medical staff. If you are requested to come to the medical department, you may do so as instructed.

FCDC01/17P&P

**ATW Medication Protocol**

From this day forward, the following protocol will be in effect related to ATW medications:

II. All State, Fed, and ICE inmates will take their medications with them when going ATW from this facility.

III. Medical staff will write with a black sharpie-state, fed, or Ice-on all current state, fed, and Ice inmates' medication administration records and medication blister packs.

IV. Medical staff will write with a black sharpie-state, fed, or Ice-on all inmates' medication administration records and medication blister packs received into the facility from this day forward.

V. Medical boxes will be checked daily for ATW medications.

VI. Medical staff will check refrigerators for ATW Insulin.

VII.   Medical assistants will verify thru Tiger Commissary if the county inmate purchased the medication while incarcerated.

If the county inmate purchased the medication, then the medical staff will contact the inmate to advise that they can pick up the medication between normal business hours. The inmate will also be advised that if the medication is destroyed, they place the information in the Record of Drugs Destroyed book.  If the county inmate did not purchase the medication, then the medication will be destroyed and information will be placed in the Record of Drugs Destroyed book.

VIII.   If the inmate's family brought the medication, then the medical staff will contact the inmate to advise that they can pick up the medication between normal business hours.  The inmate will also be advised that if the medication is not picked up within 7 days that it will be destroyed. If the medication is destroyed, then place the information in the Record of Drugs Destroyed book.

c.    **Psychiatric Care**

(1)    For emergency psychiatric care, follow procedures for emergency health care as outlined in SECTION 010, EMERGENCY HEALTH CARE.

(2)    Detention facility staff shall immediately advise the detention facility nurse if an inmate tells them they are having suicidal thoughts or intentions. Counseling Associates, Inc. shall be contacted for an emergency screening.

(3)    The jail administrator will schedule training of detention facility personnel in the detection of  special needs detainees and the observation and handling of special needs detainees as new personnel are assigned.

d.    **Delousing**

a.    During the intake procedure and at all other times, detention facility staff shall closely observe for body parasites. During the intake procedure, **ALL** detainees will be made to shower and shampoo with the delousing solution. The staff shall constantly monitor detainees for signs of body parasites. If the staff, in their judgment, suspects a detainee has body parasites they shall:

**Go Back To Index**                                     21.2



FCDC01/17P&P

(a)    Have the detainee rub a delousing shampoo approved by the Arkansas Department of Health on body and hair and then shower.
(b)    Spray the detainee's clothing, bedding and cell area with a Arkansas Department of Health approved spray.
(c)    Re-observe detainee after 48 hours to be sure the parasites were destroyed. If not, repeat steps outlined above.

e.    **Emergency Procedures:**
At least one person per shift shall have training in health care receiving and screening, cardiopulmonary resuscitation (CPR) and recognition of symptoms of the illnesses most common to the facility. All detention facility staff shall be trained regarding recognition of symptoms of mental illness and retardation.

f.    **Medical Segregation:**
(1)    Other than provided in SECTION 014, ADMINISTRATIVE SEGREGATION, detainees may also be segregated for medical and medical treatment reasons.

(2)    All medical segregation will be at the direction of the detention facility nurse.
(a)    Detainees that are diabetic.
(b)    Detainees on medication that may adversely affect their behavior, coordination or demeanor.
(1)    Detainees that are very ill, but not so ill as to require hospitalization.
(d)    Detainees who are asthmatic.
(e)    Detainees whose health could be adversely affected by the ingestion of sweets, salt or other edible items on the commissary list.
(f)    A person in the regular detention facility population that are on special or restricted diets who do not show a willingness to comply with the dietary restrictions.
(g)    Persons infected or suspected of being infected with a communicable disease.
(h)    Other persons for medical reasons or cause as determined by the doctor or nurse.

(3)    Medical segregation will not be a disciplinary procedure.
Detainees may waive or refuse medication and request removal from medical segregation. The detention officer passing medications will so note such refusal on the medical record. If the detention facility nurse determines that this type of transfer would be medically dangerous to the health of the detainee or of the detainees in the general population, the transfer may be refused.

**Re: Insulin administration**
Insulin should be kept out of direct sun light and between 36-46 degrees. It should not be left out of the refrigerator for more than 2 hours.  Insulin should be drawn up and administered by the detainee while the officer watches.  If due to visual problems, a detainee is unable to draw up own insulin please have an officer draw up the insulin and have it verified by a second officer both should initial in the officer signature area.

Glucose below 60, give patient oral glucose and orange juice if able to swallow and notify the nurse/physician for further orders.  If patient unresponsive/unable to swallow notify medical staff immediately.  Glucose levels greater than 400 notify nurse for supplemental insulin orders.  When giving supplemental insulin, it is still necessary to give scheduled doses of insulin.

**Go Back To Index**                                                          21.3

23

FCDC01/17P&P

g.    **Dental Services for ADC/FEDS/ACT 309**
      (1)    When a detainee requests or may require, dental attention, the detainee health care request slip shall be directed to the nurse who shall make an appointment with the appropriate dentist. Emergency dental services shall be provided on an as needed basis. The detention facility nurse shall make an effort to secure the services of a dentist in an emergency situation.

(1)    **Medical Co-payments**
       **Detainee's visits to sick call:**  Visits to any doctor, transportation costs, and any other costs associated with a detainee's medical expenses shall be subject to a co-payment schedule as determined by the jail administrator.

       **Re: Medical Release**
       Please DO NOT call the medical staff requesting them to release a detainee.  Decisions regarding medical release will only be made by the captain or sheriff.

       **Re: Insulin administration**
       When giving R insulin per nurse's order for elevated blood sugar, it is still necessary to give the regularly ordered insulin.  On review of insulin records, it has been noted that when an inmate is receiving R insulin they are not always getting the scheduled insulin dose.  If there is any concern about blood sugar level prior to giving scheduled insulin please feel free to contact the nurse on call.

       **Re: Intake Forms**
       Please put all ORIGINAL medical intake forms in the medical box.  There is no need to make copies of these forms.

       **RE: MEDICAL STAFF AND ADMINISTRATION**
       Inmates will not be allowed to come up to the fence and speak to the medical staff or administration.  If the inmates attempt to come up to the fence and speak to the medical staff or administration, corporal or officers are to advise the inmates not to speak to them (medical staff or administration).  In addition, corporals or officers should tell the inmate to place all medical problems on a medical request form.

       **Re: Inmate Medication Sheets**
       Medication sheets will not leave FCDC (Units 1 or 2) when an inmate is released.  This includes when inmates go ATW to other facilities.  Please put the inmate's medication sheet in the medical staff's box upon date of release.

       **Re: Otc From(s)**
       As of 1-25-08, OTC Forms will be picked up on Mondays unless it is a holiday or otherwise. These forms are designed to last the entire week.  A binder will be provided to keep the form(s) together.  Also be mindful to have the form filled out by an officer completely and correctly. This allows us to keep up with inventory, billing, and other medical duties.  We appreciate your assistance on this matter. OTC meds can now be passed out when you do vitals at 0400 and 1800.

       **RE: Medical instruction**
       When the nurse gives medical instructions, this information must be written in the pass down. Then, you must follow those medical instructions as directed.

**Go Back To Index**                                      21.4

24

FCDC01/17P&P

Adult and Juvenile OTC's

All oral OTC medications must be taken in front of an officer at the time of purchase. Only one package may be purchased at a time. Each package is a single dose; OTC creams, ointments, powders, etc are exempt. This applies only to oral medications. All OTC products will be available for purchase at routine medication times (0600, 1200, 1800, and 2200).

Physician Orders

Please do not give cotton blankets to inmates unless authorized by clinic.

Pregnancy Protocol

1. Regular Diet (No Double Portions).
2. Milk all Meals
3. Extra bowl of rice with lunch meal
4. Bowl of Rice @ 2200
5. One Mat at bedtime
6. No daytime use of Mat unless authorized by facility physician or nurse.

Physician Orders

All Inmates with CPAP Machines will receive their machines @ 2200hrs (Mandatory Rack Time Per FCSO Policy / Procedure) and be taken up @ 0600 – unless otherwise directed by nurse.

Please do not adjust kitchen list for inmates unless authorized by clinic.

**Go Back To Index**                21.5

25

FCDC01/17P&P

## SECTION 022
## FOOD SERVICE

**POLICY:** It is the policy of this detention facility to insure that the food served in the facility is fresh, nutritional and of sufficient caloric value and that the management of the food service is efficient and in line with established procedures.

**PROCEDURES:**

a.    **Meals and Menus**

(1)    All detainees, including those in disciplinary confinement, shall be offered three (3) meals at regular intervals each day. This food shall be served at the proper temperature, provided in sufficient quantities to provide an adequately balanced diet.

(a)    The minimum daily calorie level offered to sedentary detainees shall be 2300 calories. Active inmates will receive double portions of the main dish. That will give them a total amount of 2700 calories.

(b)    The meals will contain the recommended dietary allowances and the basic food groups.

(2)    Menus for meals served will be reviewed once or more annually by a registered or certified dietitian for adequacy.

(3)    Meals shall be served at specific planned times by the staff member designated. Food shall be served promptly after it is prepared to insure that hot food is served hot and cold food is served cold. Tea or milk (or a suitable substitute) as well as the appropriate condiments will be served with each meal.

b.    **Inspections**

(1)    All food service areas shall be inspected visually on a daily basis by detention facility staff and appropriate corrective measures shall be taken immediately when discrepancies are found.

(2)    The detention facility jail or his designee shall make a formal inspection of all food service areas at least once a month and substantial deficiencies shall be recorded and corrected.

(3)    The detention facility administrator will request, through the county health office, a food service inspection at least once annually.

c.    **Food Service**

(1)    The serving area and serving methods, the kitchen, kitchen equipment and food storage facilities shall conform to the Arkansas Department of Health rules and regulations pertaining to food service establishments.

**Go Back To Index**                    22.1



① Designated Health Authority
② C.Y. ambulance 1st

Leslie Moore  Paramedic
Designated Health Authority
Non-emergency

Never Deposed

# First Aid for
# Detention Officers

Leslie Moore
Faulkner County Detention Center

27

# Detainees

- Once a detainee is injured or ill – they also become a patient that deserves the same medical care they can receive in the real world.



# Booking Refusal

- If a detainee can not walk in without assistance (unless this is their normal state) due to illness, alcohol or injury – they should be refused until the arresting officer has them cleared by the emergency room physician.
- Refusals must be made by a Sergeant or above or medical.
- Know the charges when Medical is called.

# MEMS

- Mems  Does NOT have the authority to clear the patient.  They must be seen by a physician.



# Emergencies

- Cardiac Arrest: Start CPR



  - Call Ambulance
  - Call Nurse



31

# Respiratory Distress



- Call Nurse Immediately
- Note:  Does patient have cyanosis?
-  Does  patient have a bluish tinge to fingers?
- Vitals



32

# Respiratory Arrest

- Start Ventilations
- Call Ambulance
- Call Nurse



33

# Falls

- If patient hit his head, neck or back
- Do NOT move until evaluated.
- Can patient wiggle fingers and toes
- Does patient complain of pain.
- Get vitals & Call nurse



34

# Broken Bones

- Call Nurse immediately.
- Do Not Move
- Do Not Attempt to re-align or move bones

# Minor Bleeding

- Cover with clean towel
- Notify nurse with description of wound.
- Remember – blood looks massive and the wound may be minor.
- Look before you panic



# Stab Wound

- Call Nurse immediately regardless of the size of the entrance wound.

- The entrance does not indicate the damage done.

- If internal organs are protruding, cover with a wet towel – do not attempt to replace



# Impaled Object

- **NEVER** remove an impaled object from the body.



# Arterial Bleeding

- Any wound that is spurting bright red blood is critical.

- Call nurse immediately

- Apply direct pressure to wound with a clean towel.

- Get vitals

# Vomiting Blood

- If a patient is vomiting blood call nurse immediately.
- If the blood is bright red – this is active bleeding
- If it looks like 'coffee grounds' this is old blood that has accumulated in the abdomen.

- This is an EMERGENCY!!!!!!

40

# Seizures

- Place patient where he can not harm himself
- Patient may lose control of bladder and bowel
- Attempt to awaken with ammonia inhalants
- Never stick fingers in the patients mouth.
- Never place any other object in patients mouth.
- If seizure lasts more than 2 minutes or re-occurs, call the nurse.

41

# Head Injuries

## Head injuries have many different presentations.

42

# Projectile Vomiting

- Excessively strong vomiting

- True Emergency – Call nurse immediately



43

# Racoon Eyes

- Indicates Basilar Skull Fracture or Facial Fracture



44

# Battles Sign

- Indicates Basilar Skull Fracture



Battle's sign

45

# Clear  Fluid From Ears

- Indicates Skull Fracture

- HALO test

- True Emergency – Call Nurse

- Do not move patient

46

# Unequal Pupils

- Ask patient if normal for him
- If not, this is a true emergency.
- Call nurse immediately.
- Time is critical in this instance.



47

# Fentanyl

- Fentanyl is one of the most abused and dangerous drugs that available illegally at this time.

- Just touching a Fentanyl patch has caused death.

- Patch on patient – don't touch – call Medical!!!!

48

# Blood Pressure

- If Systolic (top number) over 180
- Or if Diastolic (bottom number is over 120
- Or pressure is below 90/60
- Check previous readings – if not normal for this patient – Call the Nurse

49

# Anaphylactic Reaction

- Severe allergic reaction.
- Airway may swell closed
- Respirations may stop — CM Ambulance
- This is a true emergency.
- Call nurse immediately
- If nurse not in the building – call an ambulance.

50

# Final Statement

- NEVER PERFORM A PROCEDURE THAT YOU ARE NOT TRAINED AND LICENSED TO PERFORM.

- YOU CAN FACE CRIMINAL CHARGES

51