IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SANDRA JONES, Personal Representative of
the Estate of Antonio L. Jones, Deceased                                          PLAINTIFF

VS.                                            NO.  4:21-cv-444-BRW

FAULKER COUNTY, ARKANSAS;
DR. GARRY STEWART, M.D., Individually,
KAREN GRANT, Individually,
and LEANNE DIXON, Individually                                                 DEFENDANTS

28 U.S.C.A. § 1746 AFFIDAVIT

STATE OF ARKANSAS            )
                             )    ss:
COUNTY OF FAULKNER           )

Comes now Karen Grant, and states, upon oath and on personal knowledge (except where indicated), the following::

1.      I am a Licensed Practical Nurse (LPN). I worked in that capacity for Faulkner County in the County jail in 2019 as a W2 employee of the County.

2.      On August 8, 2019, sometime after 3 p.m. (about 3:20-3:30, to my recollection), Leanne Dixon, our CNA medical assistant, called me from booking (I was in the facility medical clinic in another part of the building) to report that a detainee, Antonio Jones, was shaking and sweating. She also told me that detainee Jones was fully coherent and answering questions appropriately.  Neither Dixon nor anyone else ever told me that they thought he had taken anything, including drugs, which they always do if they have such a suspicion (I later learned that was because they had, on more than one occasion, asked him whether he had taken anything and denied taking any drugs or being under the  influence of any drugs or alcohol). While it was August (many of the

1                **Exhibit 2**

detainees were sweating), I was concerned about a possible diabetic issue, so I instructed Ms. Dixon to take a blood sugar reading from the detainee.  Dixon called me back a few minutes later and reported that his blood sugar reading was 85, which is completely normal (she also mentioned that they had been unable to get a blood pressure as his arm was shaking, but that is not particularly abnormal, as they utilize an automatic blood pressure cuff that doesn't tolerate much movement). As such, I instructed Dixon to place the detainee on medical watch - which means placing him on the booking bench, in full view of numerous officers, to be checked on every 15 minutes and to have his vital signs (blood pressure, pulse, respiration, pulse ox, temperature) taken on an hourly schedule - and to report back any changes in condition or abnormal readings. The officers have "automatic" instruments for taking these readings, where necessary (respiration, for instance, is just counting breaths), with instructions on the instruments themselves (e.g., the blood pressure cuff) or the case in which it was held (e.g., tympanic thermometer) and "normal range" charts were also available.

       3.      After ordering that detainee Jones be placed on medical watch with any changes in condition or abnormal readings to be reported back to me, I went back to other work until a short time later when Ms. Dixon returned to the clinic.  She repeated what she had told me on the phone. She also confirmed that Jones had, in fact, been placed on medical watch and was being checked on every fifteen minutes and that the officers had expressed understanding that they were to take his vital signs on an hourly schedule and report any problems.  Her shift ended shortly after that conversation and she left the facility.

       4.      After speaking with Dixon in person only a short time after we had our initial phone call about detainee Jones's presentation and my decision to place him on medical watch, I heard nothing further until the officers called me with new vital sign readings; this occurred sometime

around 4:30-4:45 p.m. They reported that Mr. Jones blood pressure was 103/85 and that his pulse oximetry (blood oxygen saturation level) was in the 90s, both of which were patently normal, if not excellent, readings (the fact that they took a successful BP was also noteworthy to me, as it indicated that his shaking might have dissipated since the initial report). I asked what else was going on and they told me that he was still sweating and shaking (which indicated to me that his overall condition was essentially unchanged), but mentioned nothing else.

5. After the call regarding his second/normal vital sign readings, I received no further information until shortly (i.e., a minute or two, I recorded the time as 4:59 p.m.) before 5 p.m. when Officer Calene Scott called me and told me that detainee Jones's nose was bleeding. I asked him whether it was "trickling" or "gushing" blood (minor bloody noses occur frequently in the jail for a variety of reasons). He said that the detainee was grunting and was throwing up and bleeding out of his nose and they asked me to come to booking. I told them to get him over a trashcan (I understood him to be conscious and vomiting at that point) and told them that I was not the nurse on call, but that I was coming down to booking immediately.

6. When Officer Scott asked me to come to booking, I immediately headed that way. While the medical clinic is only a short distance from the booking area (probably 40 yards or so), I had to go through five locked doors, which requires an officer in the control room to "buzz" me through each time. Additionally, I was walking with a cane at that point due to some health issues of my own. Nevertheless, I arrived in 2-3 minutes (I recorded the time as 5:03).

7. When I arrived in the booking area, I saw Officer Homan attempting to rouse detainee Jones with an ammonia capsule and I immediately instructed the officer at the desk to call 911. I also immediately began examining him and noted that the detainee's pupils were fixed and dilated

3

and that he had blood coming out of his left nostril and the right side of his mouth. His skin was cool and clammy to the touch (which made sense in light of the report of sweating; I would note that his clothing was not wet or even damp) and he had no pulse, at least that I could feel. I asked the officers to place him on the floor and begin CPR and they immediately followed my instructions. I then instructed them to get the AED, but it advised "no shock" so we were unable to use it at that time. He was also quickly given Narcan, with no effect. CPR was continued until the fire department and EMS arrived and they continued care until the detainee was taken away from the jail.

8. From the time I first heard about detainee Jones and his situation, at or shortly before 3:30 p.m, until I arrived in booking just a minute or two after 5 p.m., no officer or employee of the jail (or anyone else) ever mentioned that they thought detainee Jones needed to be taken to the emergency room or otherwise provided emergency medical care (additionally, officers regularly called 911 without contacting me first, but no one did that here, to my knowledge, presumably because no one perceived an emergency until the time I arrived in booking just after 5 p.m.). Additionally, prior to my conversation with Officer Scott just a minute or two before 5 p.m., no one had asked me to come to the booking area to see detainee Jones in person. I would note that the officers are generally not shy about asking me to come to see detainees in person.

9. Other than insurance related to the operation of my vehicle and/or homeowner's insurance (neither of which are applicable to this case), I have no insurance coverage for negligence or negligent conduct of any kind, including but not limited to medical negligence or malpractice (I never carried medical negligence/malpractice insurance with the County because I understood the law to provide immunity for me in that context when I was employed withe County). Further, while Faulkner County is (and has been, for many years) a member of the Association of Arkansas

Counties Risk Management Fund, that membership provides no coverage for negligence or negligent conduct of any kind.

**28 U.S.C.A. § 1746 Affidavit Oath**

I declare under penalty of perjury, upon oath and on personal knowledge (except where indicated), under the laws of the United States of America, that the foregoing is true and correct.

_____
Karen Grant

10-27-22
Date