1      # Exhibit C

Sandra Jones /Antonio Jones v. Faulkner County, et al.

United States District Court

Eastern District of Arkansas, Central Division

Phil Stanley
Plaintiff Expert Report
August 30, 2022

## INTRODUCTION

My experience in the field of corrections spans fifty years, starting in 1969. My current

resume is attached as Exhibit A. I began my career by working with juveniles as a counselor at a

juvenile correctional facility in Washington State for three years. Thereafter, I have worked with

adult offenders at every stage of the criminal justice system, including probation, parole, work

release, prisons and jails. My thirty year career with the Washington Department of Corrections

included work at all levels of the organization, with progressively more responsibility at each

level. I was Superintendent (Warden) of three prisons, including the primary prison for mentally

ill inmates (Special Offender Center). The final three years of my Washington State career was

as Regional Administrator, with overall responsibility for three prisons, including approximately

one-third of the prison population of Washington State.

After retirement from Washington Department of Corrections in 2000, I was appointed as

Commissioner of the New Hampshire Department of Corrections and served two governors over

four years, responsible for leadership of all prisons and parole programs. During this time the

New Hampshire Department of Corrections prisons and parole operations, including programs

for the mentally ill, was fully accredited by the American Correctional Association. The

accreditation process requires a jail or prison to follow national standards of care and custody for inmates.

From 2007 to 2012 I was the Director of the Chelan County Regional Justice Center, the primary jail (380 beds) for Chelan and Douglas Counties in central Washington State. While the Director, I participated in the revision of Jail Guidelines for Washington State jails, for the Washington Association of Sheriffs and Police Chiefs. These jail guidelines have since become the standards for jails in Washington State. During that time I was also a board member of the Regional Support Network (Mental Health) for that area of Washington State. I am acutely aware of the challenge of housing persons with long-term substance abuse problems, as well as the issue of dealing with those inmates with severe mental health issues in a jail or prison environment.  My opinions are based on my experience and knowledge of contemporary national standards for jails, regarding how to prevent serious injuries and deaths for those in jail custody.

For the last eight years I have consulted as a jail expert related to court cases, for both plaintiff and defense, in Washington State, California, New Mexico, Mississippi, Texas, Wisconsin, New York, Oregon, Iowa and Illinois. In 2015, I was appointed federal monitor of a Settlement Agreement, regarding jail conditions, in Farris, et al. v. Franklin County, U.S. District Court, Eastern District of Washington, reporting to a Federal District Court Judge. In December 2018 I began work as a federal monitor in Disability Rights Washington v. Yakima County, U.S. District Court, Eastern District of Washington, a case involving provision of services for mentally ill in the Yakima County jail.  I have also provided analysis and recommendations to two Sheriffs and a Police Chief on their operation of jails, including the care of mentally ill inmates, inmates in alcohol withdrawal and inmates who indicate a risk for suicide.

Exhibit B is a list of documents I have reviewed in preparation for this report. Exhibit C contains a list of cases in which I have testified in the past six years and Exhibit D identifies my compensation fees for expert work. I have not published any articles in the last ten years.

## MATERIALS RELIED UPON

In order to provide analysis and opinion in the case of Sandra Jones for the Estate of Antonio Jones vs. Faulkner County, et al., I have reviewed a wide variety of materials provided by plaintiff's attorneys. The primary documents I reviewed include: Complaint; Answer; Deposition of Thomas Samanich; Deposition of Bryan Homan-Santos; Deposition of Lt. Calene Scott; Deposition of Karen Grant, LPN; Deposition of Chris Riedmueller; NCCHC powerpoint re Illicit Drug Body Packing, Body Stuffing & Consequences; Democrat/Gazette article on meth overdosing in Arkansas Correctional facilities; Methamphetamine Body Stuffers: An Observational Case Series, by the American College of Emergency Physicians, October 2009; BJA article re Managing Substance Withdrawals in Jails; Act 153 of 2017, codified at A.C.A. sec. § 12-26-101 et seq. , the Act establishing the Criminal Detention Facilities Review Committee and its authority; Criminal Detention Facility Standards, 2014; Faulkner County CJ-9A reports 2009 to 2020; Criminal Detention Facilities Review Coordinator's 2017-2019 assessments of Units I and II Faulkner County Detention Center; Former Jail Administrator, Chris Riedmueller's Staff analysis and recommendations in response to Coordinator's 2017 assessment; Dr. Stewart's 2019 contract; FCDC Policies and Procedures Manuals 2013 and 2017; Treatment Protocols (Medical Staff Only);Medical Book for detention officers; Medical and Suicide Watch Protocols; various detention officers' statements, including K. Grant, LPN,

and L Dixon, MA; Written statement by inmate Andy Meherken; FCDC Bookin file; Jail Administrator, Chris Reidmueller's email to Faulkner County Atty Martin; Former Jail Administrator's email listing medical staff on August 9, 2019;Faulkner County Coroner's report; State Crime Lab Autopsy and Toxicology Reports; Arkansas Sheriffs' Manual; Internal affairs video interviews of A. Mason, T. Samanich, K. Brockman, and Nurse Karen Grant, LPN, and Leann Dixon; and City of Conway Fire Department Run report.

I also reviewed the American Correctional Association Core Jail Standards, First Edition (2010), and the National Commission on Correctional Health Care Standards for Health Services in Jails (2014).

## OVERVIEW

Antonio Jones was arrested on August 7, 2019 and was transported to the Pope County Jail in Russellville, Arkansas, where he spent the night. The next day on August 8, 2019 Mr. Jones was transported to the Faulkner County Jail in Conway, Arkansas. The booking process at Faulkner County Jail began at approximately 10:00 a.m. The booking process was interrupted, and Mr. Jones was placed in a holding cell in the booking area. At approximately 3:00 p.m. Mr. Jones was taken from the holding cell to be fingerprinted, which is part of the booking process. At this time, as he was being fingerprinted, detention officers noted that he was sweating profusely, that his eyes were enlarged and there was redness in his eyes and he had difficulty with his balance. Per the directives in the so-called "medical book", the jail officer placed Mr. Jones on a bench in front of the booking desk to begin taking Mr. Jones vital signs. At 3:19 p.m., the jail medical assistant attempted to assist and called the on-duty nurse and advised her that Mr. Jones was shaking, sweating, eyes really red and that the jail officer was starting to take his vitals. LPN Nurse Grant directed that they inquire if he was diabetic and to take his blood sugar level. At

3:23 p.m. the medical assistant called the medical clinic to report that they were unable to obtain Mr. Jones blood pressure or temperature due to Mr. Jones shaking too much and his blood glucose was 84. At that time, the nurse directed that they put Mr. Jones on a 4 hour medical watch and take his vital signs every hour. At 3:25 p.m. the jail officer handcuffed Mr. Jones to the armrest of the bench and started the medical watch and brought him a cup of water but Mr. Jones was shaking so badly that he spilled the water on the floor. Mr. Jones was asked if he had taken any substance but he denied this. At approximately 4:00 p.m. a jail officer called the nurse to verify how often they were to obtain Mr. Jones vital signs. The jail officer informed the nurse that Mr. Jones was shaking and a blood pressure reading registered 260. Nurse Grant told them to take the vital signs every hour. Mr. Jones condition worsened and he was making grunting noises and saying nonsense words. Nurse Grant was called again and she responded that he had probably taken something, that she was not needed, and she was not the nurse on call. At approximately 4:20 p.m. another blood pressure reading showed 103/85 and a pulse rate of 91, both tests were taken by the detention officer. According to the "Medical Book", which provides directives to detention officers, these readings did not warrant calling the LPN and so no call was made. Included in the "Medical Book" is a description of readings of blood pressure, blood sugar, and pulse which create a threshold level that must be reached before the detention officer can call a nurse for medical help for an inmate.  In large, bold, lettering is the statement "Criteria to be Obtained Prior to Calling Nurse."  The "Medical Book" also has a statement on the bottom of a page which describes medical watch protocol, which says "Do Not Send Any Inmate to the ER Without Nurse Approval." At 4:45 p.m. Nurse Grant was called again and there was a request she come to booking to see Mr. Jones. At approximately 5:00 p.m. Mr. Jones was observed by jail officers to be visibly salivating, shaking and grunting. Nurse Grant was called

but rather than come to booking, she advised to keep him on medical watch. At approximately 5:10 p.m. a jail officer shook Mr. Jones and there was no response. Then a jail officer popped ammonia capsules three (3) times, under his nose, with no response from Mr. Jones. He was bleeding from the mouth and he then collapsed. Nurse Grant finally arrived. Mr. Jones was un-cuffed and laid on the floor where CPR was started. Nurse Grant finally authorized Sgt. Scott to call the ambulance. The defibrillator was applied ten (10) times to no effect.. At 5:24 p.m. Taylor Martin, Faulkner County Attorney, authorized the jail administrator, Chris Riedmueller, to release Mr. Jones to the outside hospital. When the ambulance crew arrived, they attended to him. After thirty five (35) minutes Antonio Jones was pronounced dead.

This expert report is based on materials provided to this date. The report may be amended if further information is subsequently provided.

FAILURE TO INTERVENE TO TREAT ANTONIO JONES DRUG OVERDOSE

The moment an individual is taken into a jail, they come under jail custody, where the jail assumes all care for the individual. If an inmate is undergoing a serious medical issue, it is extremely important to get information from the inmate or act quickly, based on physical observation of the inmate. New inmates do not always provide truthful responses when asked about physical and mental health and therefore it is extremely important that the booking officer observe the inmate and act on any available information to prevent the inmate from harm. The intake process at a jail is a critical fact finding process where as much as possible is learned about the newly arrived inmate, in a short period of time. It is not overstating the fact that the first hours of an individuals incarceration can often be a matter of life and death.

At the Faulkner County Jail, the booking process for Antonio Jones started at 10:00 a.m. and then was interrupted, not resuming again until 3:00 p.m. When the booking process was resumed, to take his fingerprints, Mr. Jones was visibly shaking. Had a nurse come to booking and observed Mr. Jones firsthand, when he arrived at 10:00 a.m., and had taken his vital signs, it is possible that Antonio Jones would have been given more immediate care and medical scrutiny at the jail and then he may have been taken to an outside hospital where his life could have been saved.  In the hours between 10:00 a.m. and 3:00 p.m., other inmates in the jail observed Mr. Jones shaking, but this behavior was not noticed by jail officers making their rounds. It is my belief that jail officers are not trained medical technicians and should not be taking vital signs in the place of trained nursing staff. The Faulkner County Jail should have had a process where a jail nurse would come to booking based on a jail officer's observation, to take the vital signs in person. Instead, the Faulkner County Jail had a practice, represented by what was referred to as the "Medical Book", which required the jail officers to take vital signs if they observed an inmate undergoing suspected medical issues, and then use those readings of vital signs to refer an inmate to medical or not, based on those readings. This process created an unnecessary barrier to provision of immediate health care that proved fatal to Mr. Jones.

The document, providing direction to jail officers, in the "Medical Book" was headlined "Criteria to be Obtained Prior to Calling Nurse". This directive was meant for jail officers to use to take vital signs for blood sugar, blood pressure, medication approval, chest pain, and seizure activity. This directive describes levels for blood pressure and blood sugar that must be reached before calling a nurse. With regard to chest pain, there is no blood pressure level described which dictates to the jail officer whether to call the nurse or not. With regard to seizure activity, the implication of the directive is that a nurse should only be called if a seizure lasts more than five

minutes. At the bottom of the directive, there is clear language that says "Do Not Send Any Inmate to ER Without Nurse Approval!".  The primary problem with the directive for jail officers is that there is an implication that they have the necessary medical training to administer blood sugar and blood pressure tests, as well as other vital signs and interpret this information reliably. The level of training and expertise among jail officers at the Faulkner County Jail, to read these vital signs, was very questionable. Their training was slipshod, as will be explained below. I have never worked in a jail environment where jail officers took these type of vital sign readings and some type of level had to be reached before calling nursing staff. The job of a jail officer is to observe the jail environment and the inmates in that environment and summon aid if they observe an inmate undergoing physical duress, such as occurred with Antonio Jones.

   Among the failures at the Faulkner County Jail is the disregard of the obvious physical signs that Antonio Jones was suffering a major medical problem. It is my belief that jail officers were not trained to recognize the signs of drug overdose. The autopsy results by the Arkansas State Crime Laboratory, on August 9, 2019, reported Antonio Jones died from methamphetamine intoxication and that "It is likely that the bag recovered from the stomach had contained methamphetamine and that he had swallowed the bag intentionally to avoid detection when taken into custody by law enforcement".(p. 7). The Faulkner County Coroner, in their report dated October 14, 2019, made a  finding of cause of death being methamphetamine intoxication. The Jail Standards for Arkansas by the Criminal Detention Facility Review Commission (February, 1988) in the medical section states "A medical training program or suitable alternative shall be established for detention personnel, such as CPR, First Aid, or any other available programs that will aid in the recognition of signs and symptoms and of and knowledge of action requires potential emergency situations".(Section 10-1009). There is ample research and literature

regarding "body stuffing" where an individual, facing arrest may ingest a quantity of drugs, to avoid detection. The National Commission on Correctional Health Care describes "body stuffing" as "spontaneous swallowing of unwrapped or poorly wrapped drugs when feeling apprehension to dispose of evidence. (Power Point presentation by NCCHC on Illicit Drug Body Packing, Body Stuffing & Consequences). Nurse Grant, in her deposition was asked whether she had provided training to jail officers on the observation of inmates under the influence of drugs and she responded "it wasn't upon, like, use of drugs or anything. It's just if you had somebody that was on drugs, you know, please approach them with caution. You know, somebody that was, you know, it was just generalities. It wasn't anything in depth." (p. 16). In my opinion, this comment speaks volumes about what jail officers did not know in terms of dealing with inmates suffering an overdose. Jail officers need specific instructions to proceed when they see an inmate in medical duress, not "generalities." I do not believe Nurse Grant's statement is consistent with the "shall be" dictate described by the Criminal Detention Facility Review Commission, regarding training for jail officers. When Nurse Grant was asked how many jail officers she had provided blood pressure cuff training to she replied "Probably ten at most." (p. 17). This comment reveals the lack of universal training for all detention officers who were under the directive in the "medical book" to establish a blood pressure reading before calling a nurse. Nurse Grant also acknowledged that there was a high ratio of inmates who came into the jail under the influence of drugs. In her deposition she was asked what percentage and she replied "It'd be closer to 30." (p. 33). This comment illustrates that there was a critical need for jail officers to be fully informed and instructed in the signs of inmate overdose. But the staff at Faulkner County Jail were not adequately trained in the signs of overdose.

The two and a half hours between 3:00 p.m., where Mr. Jones was visibly shaking, and 5:24 p.m. when he was authorized to be taken to an outside hospital includes a litany of missteps in providing any meaningful health care. Jail officers were constrained by lack of education to actively intervene with Mr. Jones. In his deposition, Thomas Samanich, a jail officer, said "We couldn't make any decisions by ourselves. It was the nurse had to make the decisions on any medical stuff. So, even calling an ambulance if somebody is having an issue, a seizure or anything like that, we'd have to get the permission to call-you know call them." (p. 34) Jail Officer Samanich remembered seeing Mr. Jones have difficulty with his balance when he tried to take Mr. Jones fingerprints at 3:00 p.m. He said "from my perspective when I was with him, he was very shaky. He was unbalanced and uncoordinated. He was very clammy. And he had a very difficult time kind of comprehending what I was asking him and he was in a very low, monotone voice." When jail officer Samanich described Mr. Jones ambulation he said "I couldn't tell you if it was due to his size or not. I'm not trained to know that. But from what I noticed it wasn't normal." (p. 54). Officer Samanich also said Mr. Jones was shaking so bad it was difficult to get fingerprints and he said "it just seemed abnormal the way he was." (p. 55). Officer Samanich also said he was worried about Mr. Jones but had to take Mr. Jones "vitals first to contact the nurse." (p. 57). When asked whether he was trained in taking vital signs by Dr. Stewart or nursing staff he replied "No." (p. 60). Nurse Grant was clearly aware of Antonio Jones physical condition at an early point. Her statement form dated August 8, 2019, says that at 3:23 p.m., "per Dixon (medical assistant,) detainee shaking and sweating…" Yet, Nurse Grant did not feel inclined to go to booking to verify Mr. Jones physical condition or take his vital signs. When asked whether he believed he should be able to take an inmate directly to the nurse if he was concerned with their health, without taking vital signs Mr. Samanich said "I 100 per cent do

believe that it should be that way," (p. 62). When jail officer Homan-Santos was asked whether he had had training on how to take vital signs he said "It was just by a coworker"(p. 46) not by medical staff. When asked whether he knew that oxygen meters didn't accurately reflect blood oxygen levels for black people, officer Homan-Santos said "I don't remember." (p. 45). In their depositions, jail officer Homan-Santos and Sergeant Scott, who were present in booking when Mr. Jones was exhibiting signs of medical emergency, echoed jail officer Samanich's description of the process to take vitals on inmates before calling a nurse. All the other jail officers stated it was routine that they went by the directives in the "medical book" before contacting the medical staff.

There are national standards of the National Commission on Correctional Health Care which apply to the circumstances of Antonio Jones' death. The standard on Access to Care (J-A-01) states "Inmates have access to care to meet their serious medical, dental, and mental health needs". This standard notes that "Unreasonable barriers to inmates access to health services are to be avoided." "Having an understaffed, underfunded or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients serious health needs" is described as a barrier. It is my belief that these descriptions of barriers were present at the Faulkner County jail. There is also a NCCHC standard for Intoxication and Withdrawal (J-G-07) which states "Protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives or opioids." This standard states "Inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility". This standard also states "Individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using recognized standard assessments at appropriate intervals until symptoms

are resolved". There is also a NCCHC standard on Health Training for Correctional Officers (J-C-04) which states "A training program, established or approved by the responsible health authority in cooperation with the facility administrator, guides the health-related training of all correctional officers who work with inmates." A compliance indicator for this standard states correctional officers "Recognize acute manifestations of certain chronic illnesses, intoxication and withdrawal and adverse reactions to medications." The practices described in these standards were clearly not in place at the Faulkner County Jail. It is my opinion that the Faulkner County Jail would be found deficient in following any of these standards.

## ADMINISTRATIVE FAILURES AT THE FAULKNER COUNTY JAIL

There were failures by the medical doctor who held the contract for medical services at the Faulkner County Jail, as well as failures on the part of the administration of the Faulkner County Jail. Dr. Stewart was the contracted medical provider for the Faulkner County Jail. The contract between Dr. Stewart and Faulkner County states he is responsible for "patient intake and screening needs assessment, and referral to appropriate medical or psychiatric providers". It is my belief that Dr. Stewart and the nursing staff under his supervision did not fulfill their responsibilities nor did Faulkner County provide due diligence over his contract, given the actions of Nurse Grant regarding Antonio Jones. During Sergeant Scott's deposition he was asked whether there were standing orders from Dr. Stewart to call the doctor in medical emergencies, as stated by Sheriff Ryals, and he said "No, sir." (p. 137). The directive in the "Medical Book" to "not send any inmate to the ER without Nurse approval", which Dr. Stewart is responsible for, is directly contradicted in the Faulkner county Jail Policy on Emergency Health Care (FCDC, Section 010) which says, "In life threatening emergencies (or those

perceived) the senior officer can escort an inmate to the emergency room. (Any retaliation for these type of transports will be reported to the jail administrator/assistant jail administrator)". When jail officer Samanich reviewed the Faulkner County policy, which he was shown during his deposition, and was asked if there were conflicting policies he replied "Yes." (p.84). This was true for each jail officer who was asked this question in deposition. In fact, each stated that they were to go by the "medical book". Even though the FCDC policy would appear to grant a supervisor authority for direct transport to an outside hospital, no administrator took the initiative to summon the ambulance, per the FCDC policy, until Nurse Grant authorized Sergeant Scott to do so. It is my belief that Sergeant Scott and other jail officers visibly saw the physical signs of Mr. Jones' deterioration  and should have used the FCDC policy to summon aid earlier. When the ambulance crew arrived, they pronounced Mr. Jones dead. While the actions by Sergeant Scott and Nurse Grant were occurring, jail administrator Riedmueller, it appears believing that Mr. Jones was still alive, received the approval of the county prosecutor, Martin Taylor, to release Mr. Jones from custody. The e-mail from the prosecutor shows a time of 5:24 p.m. which states "OK to release to hospital."

　　During his deposition, jail administrator Riedmueller was asked what an officer was expected to do when doing cell checks jail and he said "I would expect them to walk through the area, check inside the cells, and ensure that everything appears to be in order, everybody appears to be safe." (p. 44). These cell checks of Mr. Jones should have resulted in observing Mr. Jones physical deterioration much earlier than 3:00 p.m. Mr. Riedmueller was asked whether the jail officers should have observed Mr. Jones "visibly shaking", as described by other inmates, in the hours between his initial arrival at the jail at 10:00 a.m. and when he was removed from a booking cell to be fingerprinted at 3:00 p.m. and he said "Yes, sir." (p.63). When Mr.

Riedmueller was asked whether he was concerned that Nurse Grant's actions were not consistent with her duty to provide timely and appropriate medical care for Mr. Jones, he replied "That would concern me, yes, sir." (p. 71).  Mr. Riedmueller was also asked whether he was familiar with the concept of deliberate indifference and he said "Yes, sir." (p. 72). When Mr. Riedmueller was asked whether Nurse Grant's actions were justified, given her knowledge of the behavior and vital signs of Mr. Jones as reported to her in the two and a half hours before his death at the jail, he said "In my opinion-no, sir." (p.80). Even though Mr. Riedmueller reviewed staff actions after the death of Mr. Jones, he took no action to question Nurse Grant's actions or the actions of jail officers.

The actions of Sergeant Scott, who was the on-site supervisor, who saw the visible signs of Mr. Jones drug overdose, are also of significant concern. In his deposition, Sergeant Scott said he saw Mr. Jones "sitting on a bench sweating." (p. 73). When asked whether he agreed with the jail officers describing Mr. Jones as "sweating profusely, sweating badly, shaking, sweaty, eyes really red" Sergeant Scott said "Yes sir." (p.79). When asked whether he had the authority to take an inmate to the infirmary when he observed a medical emergency, Sergeant Scott said "No, sir." (p. 134). This statement by a jail supervisor is shocking to me. A supervisor, responsible for the health and safety of inmates, on his watch, must have the authority to at least take an inmate to the infirmary if they believe there is a medical emergency. For a supervisor at the Faulkner County Jail to believe they did not have this authority, indicates to me that there is a faulty chain of command, and it also demonstrates a significant indifference to the care of inmates in the Faulkner County Jail. When asked whether he should have the authority to take an inmate to the ER Sergeant Scott said "Yes, on dealing with the circumstances we have now." (p. 138). The reality is that Sergeant Scott could have acted upon the circumstances presented by Mr. Jones

obvious physical signs, per the FCDC policy granting that authority, with or without Nurse Grant's authorization, but did not do so.

The Faulkner County Jail was understaffed at the time of Antonio Jones death.  A Criminal Detention Facilities Review by the State of Arkansas in November 2018 stated "the County staff level assessment found the agency needs at least 8 to 11 more jail officers based on current operations, at the differing sites. At the present time, due to limited staff levels, the County employees struggle as they work to secure cell checks, work to protect county property, capture agency training goals, complete paperwork, secure outdoor/exercise goals, as well as general detention duties." Mr. Riedmueller stated in his staffing analysis of the Faulkner County Jail that additional officers "would allow the majority of medical duties (medication passes and vital checks) to be reassigned away from detention staff." Putting jail officers in the position of determining the validity of vital signs was a disastrous management decision, and Mr. Riedmueller knew it was a faulty practice. The lack of adequate staffing had been noted long before Mr. Jones' death and steps to correct the deficiency were not taken by county and jail administrators. The staffing issue, coupled with untrained jail officers, faulty responses by nursing staff and confusing directives created the "perfect storm" causing Antonio Jones to unnecessarily die.

CONCLUSION

At this stage my review is based on the materials listed in Exhibit B. I am informed that at least two more depositions and an inspection of the booking and housing areas are planned and I may be asked to review this material. Should I be asked to review any additional documents, I

will be prepared to supplement the opinions stated in this report, if dictated by the additional material.

The list of failures at the Faulkner County Jail in responding to Antonio Jones overdose and the list of mistakes in providing care is unfortunately very long. The booking process was interrupted for five hours and Mr. Jones was not observed adequately during that time. When Mr. Jones was then observed at 3:00 p.m. to be "shaking and sweating profusely" there began a series of instances of inaction by jail officers and nursing staff which contributed to his death. The failure of Dr. Stewart to provide a health care system that was responsive to a health care emergency and the lack of oversight by the administration of the Faulkner County Jail was significant. The bureaucratic hurdles that were created by the directive in the "Medical Book" to summon help for Mr. Jones, are astonishing to review. The jail and its' health care provider constructed unnecessary barriers that resulted in a collective indifference by jail staff, shown towards Antonio Jones on August 8, 2019. Mr. Jones' methamphetamine intoxication should have been addressed at the jail, and he should have been moved to an outside hospital for treatment which he so desperately needed.  Mr. Jones should not have died at the Faulkner County Jail. It is as simple as that.

At this point in the development of the case, I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that these are made available for review, if requested, prior to their use.

 My fees for these professional services are outlined in the attached retainer agreement.