IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF ARKANSAS
CENTRAL DIVISION


SANDRA JONES, Personal Representative of          PLAINTIFF

the Estate of ANTONIO L. JONES, Deceased


V.                CASE NO: 4:21-cv-444-BRW


FAULKNER COUNTY, ARKANSAS                         DEFENDANTS
DR. GARRY STEWART, M.D., Individually,
KAREN GRANT, Individually,
and LEANNE DIXON, Individually


VIDEOTAPED ORAL DEPOSITION OF

DR. GARRY STEWART

THURSDAY, SEPTEMBER 2, 2022
1:35 P.M. TO 5:00 P.M.

THE LAW OFFICES OF DENTON AND ZACHARY
700 S. German Lane, Suite 101
CONWAY, ARKANSAS 72034


WAID REPORTING
P.O. BOX 10385
CONWAY, ARKANSAS 72034
(501) 620-0982
waidreporting@gmail.com


EXHIBIT
13

VIDEO DEPOSITION

2

APPEARANCES

ON BEHALF OF PLAINTIFF:
        MORRIS W. THOMPSON
        MORRIS W. THOMPSON LAW FIRM, P.A.
        P. O. BOX 662
        LITTLE ROCK, AR 72203

ON BEHALF OF PLAINTIFF:
        RANDY HALL
        LITTLE ROCK TRIAL LAWYERS
        415 N. MCKINLEY, SUITE 1000
        LITTLE ROCK, ARKANSAS 72205


ON BEHALF OF DEFENDANTS:
        MICHAEL MOSLEY
        JASON OWENS LAW FIRM, P.A.
        1023 MAIN STREET, SUITE 204
        CONWAY, ARKANSAS 72032


ON BEHALF OF DEFENDANTS:
        DUSTIN R. DARST
        RMP LLP
        710 WINDOVER ROAD, SUITE B
        JONESBORO, ARKANSAS 72401


  ALSO PRESENT
        JOHN PEARSON, VIDEOGRAPHER

VIDEO DEPOSITION

16

1  Q    I understand.  Which ones have you worked at in -- as
2  an ER physician?
3  A    Okay.  We'll start -- I did Morrilton, Dardanelle,
4  Booneville, Forrest City, Harris, Newport -- a whole chain
5  of them up in the northern part of the state.  I'm trying
6  to think of what they are -- Cherokee Village, Paragould
7  maybe, I think -- like, there's a couple of them that
8  begin with P up there.  They're side by side.  I can't
9  remember.  It's been quite a few years -- but down to
10  mean; down in the southern part of the state, I did
11  Monticello.  And that's what I can remember off the top of
12  my head.
13  Q    Fair to -- of all the towns you listed, it sounded
14  like they were smaller-populated towns.
15  A    Yes.
16  Q    Is it fair to say most of your ER work is in
17  smaller-populated --
18  A    Yes.
19  Q    -- towns?
20       And you said you'd done 1,200 shifts?
21  A    About.
22  Q    So this 12 methamphetamine overdoses you referred to,
23  did those come by and through your ER -- ER work?
24  A    Yes.
25  Q    Do -- other than your work experience, do you have

VIDEO DEPOSITION

17

1  any specialized training?  Have you taken classes

2  regarding methamphetamine addiction or how to identify it

3  and things of that nature?

4  A   Other than my work experience?

5  Q   Yes, sir.

6  A   Meaning in my -- as part of my non-work experience,

7  as part of my non-physician experience, I -- I --

8  Q   Have you taken any courses, watched any videos, been

9  to any conventions, things of that nature that -- that

10  physicians as -- such as yourself would watch or see or

11  participate in that directly impacted or the subject

12  matter was methamphetamine addiction or recognizing it or

13  training regarding that?

14  A   Yes.  I have -- I've been trained.  I was trained in

15  residency for that, then I've been to CME meetings over

16  the years where that's been part of the topics of

17  discussion.

18  Q   Tell me about those CME meetings.  What do you recall

19  about what you learned or visualize in those meetings

20  regarding methamphetamine?

21  A   I -- I really couldn't tell you specifically, but

22  I -- I think what you're getting at is you're probably

23  wanting to know what do I -- how do I recognize a

24  methamphetamine overdose.  Is that --

25  Q   We'll get --

VIDEO DEPOSITION

18

1  A   -- let me just ask you this:  Please clarify.

2  Q   We'll get there in a minute.

3  A   Please clarify.

4  Q   Any takeaways from any of this training or things

5  that you saw or referenced that you can tell me about?

6  A   I don't -- don't know where to -- how to answer that.

7  I would say probably that -- that the -- the take home is

8  pretty -- pretty standard across the board.  It's not that

9  big of a -- of a -- of a discipline, I would suppose, in

10 toxicology of overdoses.

11 Q   And you're not a toxicologist, are you?

12 A   I am not.

13 Q   Okay.

14 A   I said, "in the toxicology of overdoses."

15 Q   Sure.  Is it safe to say that methamphetamine usage

16 and addiction is a -- is an increasing problem over the

17 last five years?  Is that a fair statement?

18          MR. DARST:  Object to form.

19 A   I would not know specifically.  I haven't seen those

20 -- those exact numbers.

21 Q   Okay.  Have you seen any literature or -- or looked

22 for any literature about methamphetamine becoming a

23 problem among society or in jails or just generally?

24 A   In -- in general, yes.  I think that's the

25 understanding of the -- of the nature of the beast at this

VIDEO DEPOSITION

19

1  day and time, that it's a --

2  Q    Okay.

3  A    -- more prevalent --

4  Q    Okay.

5  A    -- problem than it has been in the past.

6  Q    And is that your understanding as well?

7  A    That is my understanding as well.

8  Q    Okay.  Let me switch gears with you.  And you're

9  pretty smart.  I am going to ask you the question you

10  pose.  But I want to just do a little housekeeping here.

11      You're not going to come to trial and give opinions

12  on causation or why Mr. Jones died, are you?

13  A    No.  I have no expertise in that.

14  Q    Okay.  And you're not going to come to trial and give

15  opinions on the standard of care, are you?

16  A    No.  I'm --

17              MR. DARST:  Object to form.

18              Answer with what --

19              MR. HALL:  I just want to make sure.

20              MR. DARST:  -- with what he --

21  A    I -- I don't know anything about Mr. Jones, so --

22              MR. DARST:  Yeah.

23  Q    (Mr. Hall)  Very good.

24  A    -- -- I can't comment about somebody that I don't

25  know anything about.

VIDEO DEPOSITION

30

1    in there that required you to train jailers for basic

2    medical purposes; is that accurate?

3    A    I did not see that.

4    Q    Do you believe that you were obligated as a part of

5    that contract, notwithstanding that it's not specifically

6    in there, to provide jailers training in basic medical

7    purposes?

8              MR. DARST:  Object to form.

9    A    No.  No.

10   Q    All right.  I want to talk about the contract a

11   little bit specifically.  I'm not asking you to be a

12   lawyer.  What I'm asking you is your impressions of how

13   you understand the contract; okay?

14   A    Yes, sir.

15   Q    Good enough.  Let's start -- let's go to Paragraph 1.

16   And it says "Doctor is to perform the following medical

17   services to be provided during a minimum of four hours per

18   week and a maximum of eight hours on site at the jail."

19   The next sentence says, Part A:  "Serve as medical

20   director for the jail."

21        What does serving as the medical director for the

22   jail mean to you?

23   A    Well, the jail needs to have a licensed medical

24   provider to oversee the health care of the inmates.  And

25   as the director, that would mean that it would be my

VIDEO DEPOSITION

31

1   responsibility to see that there were protocols in place

2   for various different scenarios that would occur and to

3   make sure that there was a pathway to purchase goods and

4   services that might be needed for health care of the

5   inmate population.

6   Q    Okay.  Anything else that you can think of that would

7   describe serving as medical director for the jail?

8   A    No, I think that about covers it.

9   Q    Okay.  Let's examine the next sentence.  It says

10  "Such duties shall include, but are not limited to,

11  patient intake and screening, needs assessment, and

12  referral to appropriate medical or psychiatric providers."

13      What is "patient intake and screening"?

14  A    Patient intake and screening is done by the -- the

15  jail employees, the jailers, commonly called "booking,"

16  where the patients are brought into the jail facility,

17  fill out some forms, ask some basic questions.  That's

18  pretty much it

19  Q    Is -- the form that they use, did you design that

20  form?

21  A    No.  I inherited that form.

22  Q    Can you tell me what's on that form?

23  A    From my memory -- which I did not look at that

24  routinely -- from my memory, it's a pretty straightforward

25  questionnaire of:  What are your current medical needs,

VIDEO DEPOSITION

72

1  A    No, because this is with regard to the medical

2  profession, and I think this was with regard to the

3  profession of nursing, but I may be wrong.

4  Q    Okay.  What's the difference in what an LPN can do

5  versus what a RN can do as far as medical care?  Can you

6  tell me?

7                 MR. MOSLEY:  I'm going to object to form.

8                 Can we go off -- let him answer your

9            question, then I've got something I'd like to go

10           off the record for.

11  A    I -- I cannot exactly -- in the jail, I could tell

12  you, but I can't tell you on this.

13  Q    (By Mr. Hall)  Well, tell me, in the jail, what's the

14  difference in -- in the duties that a RN can perform

15  legally versus the duties that a LPN can perform in the

16  jail?

17                 MR. DARST:  Object to form.

18  A    There are none.

19  Q    So they both can do the same thing?

20  A    Yes.

21  Q    And where -- how is it that you've determined that

22  they both, both an RN and an LPN, can perform the same

23  medical services and duties in the jail?

24  A    Because they're all protocol-driven and neither have

25  the ability to diagnose or treat patients.

WAID REPORTING

VIDEO DEPOSITION

74

1          MR. THOMPSON:  Yeah, I'm trying my best.

2   Q   (By Mr. Hall)  I believe that your last answer to my

3   question is that there was no difference in the

4   responsibilities or duties or things or medical care that

5   an LPN can do versus an RN inside the jail.  Is that a

6   fair statement of your testimony?

7   A   For practical purposes, yes.

8   Q   Okay.  Is there a difference outside the jail between

9   the things that an LPN can do versus an RN?

10  A   Yes.

11  Q   What are those differences?

12  A   RN has a lot more latitude, and -- and I can't define

13  -- you know, tell you specifically what they are A, B, C,

14  D.  But in the jail, the -- the -- the nursing staff there

15  is under protocol, they're protocol-driven, and they --

16  none of them can make any decisions as far as diagnosis

17  without me.

18  Q   Okay.  So inside the jail, neither an RN or an LPN

19  can make a diagnosis; is that true?

20  A   That's true.

21  Q   Are there any other --

22  A   Excuse me.

23  Q   -- differences?

24  A   Excuse me.  They can.  Their protocol-driven

25  diagnosis is for over-the-counter medications:  Tylenol

VIDEO DEPOSITION

76

1  she were to delegate any of her nursing practices to other

2  personnel?

3              MR. DARST:  Object to form.

4  A   I don't think she can delegate --

5  Q   Okay.

6  A   -- nursing practices to anyone else.

7  Q   All right.  So your understanding is, is that

8  Nurse Grant would be prohibited by law from delegating any

9  of her nursing practices to any other person other than

10 another nurse at the Faulkner County Jail; is that true?

11             MR. DARST:  Object to form.

12 A   For -- for -- for nursing issues, nursing practices

13 that are governed by rules and regulations of the nursing

14 board state law.

15 Q   I want you to turn to Paragraph 11 of your contract,

16 sir, if you will.  Will you read Paragraph 11 of your

17 contract into the record, please.

18 A   "The services herein required shall be performed by

19 doctor as an independent contractor under his sole

20 supervision, management, direction, and control; the

21 county being interested only in the results obtained.  It

22 is expressly understood that the doctor is not an employee

23 of the county, and all amounts to be paid shall be

24 considered professional services fees."

25 Q   All right.  Let's break this sentence down because I

VIDEO DEPOSITION

77

1   want to know what it means to you.  I'm not asking for a

2   legal opinion, sir.  I want to know what it means to you.

3       It says "The services herein."  Is that referring

4   back to Paragraph 1 of the contract?

5               MR. DARST:  Object to form:  Calls for a

6           legal opinion.

7   A   I would think that it is.

8   Q   Okay.  It says -- and let's go to the next sentence.

9   It says "The services herein" are -- "shall be performed,"

10  and it's under your "sole supervision, management,

11  direction, and control."

12      Is -- were you solely -- were you solely supervision

13  -- were you solely supervising, managing, directing, and

14  control -- controlling the Medicare -- the medical care of

15  the inmates at the Faulkner County Detention Center?

16              MR. DARST:  Objection to form:  Calls for

17          legal.  Misstates several things.

18  A   I wouldn't -- I wouldn't think so.  I would think

19  that there were some -- there were some medical aspects

20  that were controlled by the -- by the jail.

21  Q   What medical aspects were controlled by the jail?

22  A   Non -- non-physician services.

23  Q   Let me ask it another way.  What medical care was

24  provided to inmates at the jail where you weren't

25  involved?

VIDEO DEPOSITION

78

1  A    Treatment for protocol issues such as headaches,

2  diarrhea, constipation --

3  Q    Well --

4  A    -- those kinds of things.

5  Q    -- well, this contract requires you to provide

6  medical services to the inmates; correct?

7              MR. MOSLEY:  Object to form:  Counsel is

8         testifying.

9  A    I don't know.

10 Q    Well, let's go back to the front of it.

11 "Doctors perform the following medical services" in

12 Paragraph 1, and then it lists all these items.

13 A    Right.

14 Q    All right.  So you are in sole control of providing

15 medical services to the inmates; correct?

16             MR. DARST:  Object to form.

17             MR. MOSLEY:  Object to form:  Asked and

18        answered.

19 A    I don't know, sir.  I'm going to have to go read

20 through this whole thing again and see if we're -- if it's

21 -- how it's defined.

22 Q    Okay.  Well --

23 A    But, again, I'm not a lawyer, so I can't -- I can't

24 make that -- make that call.

25 Q    I'm not asking you for a legal determination, sir.

79

1  I'm asking you for -- how you understand how you were

2  supposed to perform under this contract?

3  A    Well, let me read it.

4       Now, this is the one I can write on; correct.

5  Q    Yes, sir.

6  A    Okay.

7  Q    Let's see.  Number 4 is the one you can write on.

8              MR. DARST:  Well, just to be clear, what's

9          the question?

10             MR. HALL:  The question posed is:  What's

11         the definition of medical services under the

12         contract as it relates to you being in sole --

13         you have the sole supervision, management,

14         direction, and control?

15             MR. DARST:  Object to form:  Calls for a

16         legal opinion.  Asked and answered.

17             MR. MOSLEY:  Join.

18             MR. DARST:  Document speaks for itself.  I

19         think that's enough.

20 Q    (By Mr. Hall)  To clarify, I'm not asking you for a

21 legal opinion, sir.  I'm asking for your interpretation of

22 this contract as you performed it for the Faulkner County

23 Detention Center.  Do you understand that?

24 A    Yeah, I think I do.  I'm going to read this, and

25 I'll --

VIDEO DEPOSITION

80

1    Q    Thank you.

2    A    -- I'll let you know in a minute.

3              MR. DARST:  Same objection.

4              Do you want to go off the record for a

5         minute, Randy?

6              MR. HALL:  Sure.

7              THE VIDEOGRAPHER:  We're off the record at

8         3:32.

9              (Off the record.)

10             (On the record.)

11             THE VIDEOGRAPHER:  We're back on the record

12        at 3:42.

13             MR. HALL:  Madam Court Reporter, can you

14        read -- read the last question posed before we

15        took a break, please.

16             THE COURT REPORTER:  Yes.

17             The question was:  "To clarify, I'm not

18        asking you for a legal opinion, sir.  I'm asking

19        for your interpretation of this contract as you

20        performed it for the Faulkner County Detention

21        Center."

22             MR. DARST:  I voice my objection.

23   BY MR. HALL

24   Q    Specifically, sir, I'm interested in Paragraph 11 of

25   the contract where it says "The services herein shall be

VIDEO DEPOSITION

81

1   performed under his," referring to you, "sole supervision,

2   management, direction, and control.

3       And the question posed is what does that provision of

4   the contract mean to you as you perform this contract for

5   the Faulkner County Detention Center?

6                   MR. DARST:   Object to form:   Calls for

7           legal opinion.

8   A   So my interpretation is, is that for medical issues,

9   that -- that I make myself available for them.   I accept

10  responsibility for -- sole responsibility for the -- for

11  the -- for the supervision, management, direction, and

12  control of those services, so.

13  Q   So did you supervise, manage, direct, or control

14  Nurse Grant?

15  A   From time to time, yes.

16  Q   And tell me how you would from time to time

17  supervise, manage, direct, and control her?

18  A   Well, my contract was to be provided during a minimum

19  of four hours per week and a maximum of eight hours a week

20  at the jail.   So during those hours that I was at the jail

21  and she was under my -- under my supervision, then I

22  monitored what she did.   I ordered her to do the things

23  that I needed to have done.   And other than that, I didn't

24  have any responsibility for her.

25  Q   Okay.   Did you supervise, manage, direct, or control

VIDEO DEPOSITION

83

1   document that I knew nothing about.

2   Q   All right, stop right there.

3               MR. MOSLEY:  Let --

4   Q   I want to let you talk, but we got to identify this

5   document.  And when you say "this" --

6   A   This particular page right there.

7   Q   -- you're referring to the document that says

8   "Criteria to be Obtained Prior to Calling The Nurse,"

9   April 19, 2012, and it currently has an Exhibit 7 sticker

10  on it?

11  A   That's correct.

12  Q   That's what you're referring to?

13  A   Yes, sir.

14  Q   All right.  I'm going to leave this marked as

15  Exhibit 7.

16  Q   Now, we're going to come back to that.

17  A   But that's not part of this.  You had them all

18  together.  And this is a -- this is the -- this is the

19  protocols.

20              MR. MOSLEY:  Starting on page 5, is that --

21              THE WITNESS:  It says page 4 on here,

22          "Faulkner County Detention Center Treatment

23          Protocols, Medical Staff Only."

24  A   This is a different set.  These are different

25  independent protocols.  This, I don't know what that is.

VIDEO DEPOSITION

84

1    Q    (By Mr. Hall)  All right.  We're going to mark --

2    A    I have not seen that.

3    Q    -- that as Exhibit 8, a document title "Medication

4    Administration."

5                 (Whereupon, Deposition Exhibit 8 was marked

6          for identification and is attached hereto.)

7    Q    You do not know what that is; correct?

8    A    I have not seen this before.

9    Q    Okay.  Continue on, please, sir.  We'll come back to

10   that.

11   A    To my knowledge, no.

12   Q    All right.

13   A    To my knowledge, I haven't seen that.

14   Q    And when you say "that," you're referring to --

15   A    -- to Exhibit 8.

16   Q    -- Exhibit 8?

17   A    Yes.

18   Q    Okay.  What's the next page you have?

19   A    This one here?

20   Q    Yes, sir.

21   A    At the top, it says "Diabetic Protocols Updated

22   1/29/15."

23   Q    Okay.

24   A    And that, I was responsible for.  I -- I did this

25   update 2015.

VIDEO DEPOSITION

85

1      MR. HALL:  I'm going to mark that as
2      Exhibit 9.  Exhibit 9 being diabetic protocol.
3      (Whereupon, Deposition Exhibit 9 was marked
4      for identification and is attached hereto.)
5  Q   You did update this document; correct?
6  A   Yes, sir.
7  Q   All right.  Let's go to the next page.
8  A   I've not seen this document.  I don't know what this
9  is.
10 Q   This is a document entitled "CPAP Machines and Oxygen
11 Tanks."  You've never seen this document before; correct?
12 A   No, sir.
13     MR. HALL:  That's 10.
14     (Whereupon, Deposition Exhibit 10 was
15     marked for identification and is attached
16     hereto.)
17 Q   (By Mr. Hall)  Let's go to the next page.
18 A   This is -- this is a set of protocols that I have
19 seen, and these are the protocols that were in place when
20 I came in in 2005 and that I approved in general as a
21 reasonable set of protocols for them.
22     MR. HALL:  All right.  We're going to mark
23     this collective set of documents, then, as
24     Exhibit 11.
25     (Whereupon, Deposition Exhibit 11 was

VIDEO DEPOSITION

86

1          marked for identification and is attached

2          hereto.)

3               THE VIDEOGRAPHER:  Doctor, would you mind

4          sliding your microphone up a bit, please?

5               THE WITNESS:  Better?

6               THE VIDEOGRAPHER:  Thank you, sir.

7   Q   (By Mr. Hall)  In Exhibit 11 are the protocols that

8   you reviewed and/or approved when you came in in 2005;

9   correct?

10  A   Yes, sir.

11  Q   How often would you review the protocols, marked as

12  Exhibit 11, during your tenure since 2005?

13  A   Not very often, maybe once or twice every two to

14  three years I'd look at them.

15  Q   Did you ever make any changes to the protocols,

16  marked as Exhibit 11, since 2005, to your knowledge?

17  A   To my knowledge, the diabetic protocols was the only

18  one that I had changed.

19  Q   Let's go back to Exhibit 7 entitled "Criteria to be

20  Obtained Prior to Calling The Nurse."  Is your -- and I

21  don't want to put words in your mouth, sir.  Did you tell

22  me you'd never seen this before, or you just didn't draft

23  it?

24  A   I had seen that as part of another case, but I did

25  not know of its -- of its existence except for that it was

VIDEO DEPOSITION

99

1   Exhibit 11 was in -- for the most part in place when you

2   became the medical director; correct?

3   A    That's correct.

4   Q    But the -- the document we've marked as Exhibit 11

5   was, in fact, in place as of August 8th or 9th of 2019;

6   correct?

7   A    Correct.

8   Q    All right.  Now, let's turn specifically to

9   "Amphetamine/Stimulant Withdrawal."

10  A    Yes, sir.

11  Q    Are you there?

12  A    Yes.

13  Q    First of all, up at the top, it says "Medical Staff

14  Only."

15  A    Yes.

16  Q    Is it fair for me to assume that the officers and

17  guards did not have access to this particular policy or

18  Exhibit 11 in total?

19              MR. DARST:  Object to form.

20  A    Yes.

21  Q    So this particular protocol on amphetamine/stimulant

22  withdrawal would be something that Nurse Grant would

23  follow; correct.

24  A    Correct.

25  Q    I want to ask you -- at the top, it says